CONCERNED JEWISH YOUTH,
Plaintiff,

v.

Robert J. McGUIRE, in his official capacity as Police Commissioner of the City of New York, Edward Koch, in his official capacity as the Mayor of the City of New York, and the New York Police Department, Defendants.

78 CIV. 4891 (MP).

United States District Court,
S. D. New York.

May 25, 1979.

Willkie, Farr & Gallagher, New York City, for plaintiff by Howard C. Buschman, III, Debra M. Evenson, Charlotte B. Hubbell, Jeanne M. Luboja, Benito Romano, John M. McEnany, New York City, of counsel.

Allen G. Schwartz, Corp. Counsel for the City of New York, New York City by Joseph F. Bruno, Rosemary Carroll, Pamela McGovern Gaskins, New York City, of counsel.

Robert B. Fiske, Jr., U. S. Atty., S. D. New York, New York City by Frederick P. Schaffer, Jane E. Bloom, Asst. U. S. Attys., Katherine J. Trager, Sp. Asst. U. S. Atty., New York City, of counsel.

POLLACK, District Judge.

### DECISION

This is a motion for a preliminary injunction enjoining the defendants, the Mayor and Police Commissioner of New York City, from enforcing the restrictions on demonstrations at the Soviet Mission to the United Nations currently in effect. Plaintiff alleges that the current restrictions impermissibly infringe on the rights of its members protected by the first amendment guarantee of free speech and assembly.

The Soviet Mission is located at 136 East 67th Street, between Lexington and Third Avenues, on the south side of the street. The Mission building contains the offices of the Mission and residential apartments for some of the Russian employees of the Mission.

The restrictions currently enforced at the Mission by the defendants evolved from the terms of a preliminary injunction entered by Justice Dollinger of New York State Supreme Court in 1971. Plaintiff was not a party to the state court action, which has not yet gone to trial.

Defendants permit no demonstrations on the Mission block, except that they permit 12 demonstrators to stand behind barricades in a designated "bull pen" area. That area, on the sidewalk in front of the apartment building at 167 East 67th Street, is approximately 118 feet from the front entrance to the Mission, diagonally across the street toward Third Avenue.

The 12 demonstrators in the bull pen are subject to search and must identify themselves to the police on demand. No permits for the use of sound equipment are issued for the Mission block. Any demonstrators in excess of twelve and any sound equipment must remain on the far, or west, side of Lexington Avenue.

The plaintiff, CJY, seeks a preliminary injunction and order which would permit it to hold peaceful demonstrations on the Mission block. In particular, it seeks to hold demonstrations involving no more than 30 of its members on the sidewalk directly in

front of the Mission, but not blocking its front door. The proposed order specifies that no entrances to any building on the block would be obstructed. Plaintiff further seeks to use sound equipment on the Mission block, its use to be limited to the hours between 9:00 A.M. and 10:00 P.M. and not during school hours or worship services at the synagogue.

In order to be entitled to preliminary relief, the plaintiff must show

possible irreparable injury *and* either (1) probable success on the merits *or* (2) sufficiently serious questions going to the merits to make them a fair ground for litigation *and* a balance of hardships tipping decidedly toward the party requesting the preliminary relief.

*Caulfield v. Board of Education*, 583 F.2d 605, 610 (2d Cir. 1978).

### CJY

CJY is an unincorporated membership organization with about 300 members, of whom approximately fifty are active. CJY is a registered student organization at Queens College, where it is headquartered. The group was founded in 1975.

The stated goals of CJY are to combat anti-semitism, to help the Jewish poor, to work for the causes of Soviet and Arab Jewry, and to help other organizations. CJY is unaffiliated with other organizations, although it identifies with Herut-U. S.A., a Zionist group which supports the Herut Party in Israel. A CJY leader testified that most, if not all, of the aims of CJY can be accomplished through non-violent action.

In June 1978 CJY held a demonstration at the Mission. It applied for a permit to use sound equipment at the demonstration. Sixteen CJY members attempted to demonstrate on the Mission block, but only 12 were permitted to enter the demonstration area on the block. The four others had to remain on the west side of Lexington Avenue on 67th Street. Sound equipment was permitted only on the west side of Lexington Avenue. The demonstration was peaceful and orderly.

Wayne Perlmutter, a CJY leader present at the June demonstration, testified that the permitted number of demonstrators was too small to effectively carry their message to the people in the Mission, to attract media attention, or to encourage others to join their cause.

CJY was involved in two prior incidents of unlawful acts. A CJY member was arrested at a tennis match in Madison Square Garden for creating a disturbance by unfurling a banner and using a bullhorn. In a second incident, some CJY members overturned the literature tables of another student group at Queens College.

In 1978, CJY had an income of approximately $900, derived from various sources.

### Demonstrations at the Mission

Defendants put several dozen police reports into evidence. Twenty-one of the reports concerned demonstrations at which no arrests were made. The number of demonstrators at these ranged from three to 1000; eleven of the demonstrations involved more than 30 people.

Eighteen reports concerned demonstrations at which arrests were made. The demonstrations ranged in size from one to 3500; twelve had more than 30 people. The number of persons arrested ranged from one to 89. All of the demonstrations occurred between 1971 and 1978.

### The need to regulate demonstrations at the Mission

Several police officials testified as to their opinions on the need for regulation in the vicinity of the Mission. Detective Rosenthal, who had infiltrated the JDL as an intelligence agent, attended several demonstrations and stated that it was easy to goad peaceful demonstrators to violence. He believes that the police cannot control a large number of demonstrators, and felt that a safety problem would arise if the current restrictions are lifted.

Detective Perola, a bomb squad investigator, said that no bomb had been exploded at the Mission during the last nine years, but

that the police had learned of four plans to bomb the Mission during 1971–72. He said that among the tactics used by violent groups was the infiltration of demonstrations by peaceful groups to permit the bombers to approach the target without drawing the attention of the police. Perola testified that there would be a reasonable likelihood of danger to the Mission if picketing by any number of people was permitted in front of the Mission.

David Fallek, a retired police inspector who was in charge of the Mission area prior to 1972, stated his opinion that the current restrictions at the Mission are necessary to maintain peace there. He felt that any demonstration on the Mission block presents a danger to the police.

Captain Selvaggi, commander of the 19th Precinct, stated that approximately 25 percent of his force is devoted to protecting the 45 diplomatic locations in the area. He believes that demonstrators should not be allowed directly in front of the Mission because emotions tend to rise near the Mission. He said that the chance that some demonstrators would break away and try to enter the Mission poses a safety problem, because he believes that the Russians would use "deadly physical force" to eject intruders and to maintain control of their premises.

Captain Selvaggi testified as to how the police settled on the restrictions enforced at the Mission. The particular picket site was chosen so as to be more than 100 feet from the Mission (it is about 120 feet away), not to interfere with the functions of other buildings on the block (a school, a police station, a fire station, a synagogue), to be within view of the Mission (diagonally across the street), and to be on a relatively wide part of the sidewalk so that non-demonstrators may pass by. The limitation of the number of demonstrators on the block to twelve and the prohibition of the use of sound equipment appear to have been derived solely from the 1971 state court preliminary injunction. Selvaggi stated that the requirement that demonstrators identify themselves and subject themselves to search is not enforced by the police at the present time.

## Regulation of speech and assembly

■ It is well settled that picketing and demonstrations may be subject to reasonable "time, place and manner" regulations where necessary to further significant governmental interests, notwithstanding the expressive elements of such conduct. "[P]eople who want to propagandize protests or views [do not] have a constitutional right to do so whenever and however and wherever they please." *Adderley v. Florida*, 385 U.S. 39, 48, 87 S.Ct. 242, 247, 17 L.Ed.2d 149 (1966).

■ In assessing the reasonableness of a restriction on expressive conduct, "the first amendment . . . requires . . . that the balance struck in any particular situation properly reflects the central position of free expression in the constitutional scheme." L. Tribe, *American Constitutional Law* 582 (1978). The regulation of picketing must not "substantially hinder," *Amalgamated Food Employees Union v. Logan Valley Plaza, Inc.*, 391 U.S. 308, 323, 88 S.Ct. 1601, 20 L.Ed.2d 603 (1968), or "unduly constrict", Tribe, *supra* at 581, the communication of the ideas sought to be expressed.

Streets and sidewalks "cannot be put off limits to . . . first amendment activities merely to spare public expense or inconvenience." Tribe, *supra* at 689. "The right to use a public place for expressive activity may be restricted only for weighty reasons." *Grayned v. City of Rockford*, 408 U.S. 104, 115, 92 S.Ct. 2294, 2303, 33 L.Ed.2d 222 (1972). To withstand scrutiny, "the regulation must be narrowly tailored to further the State's legitimate interest." *Id.* at 116–17, 92 S.Ct. at 2304.

> Whenever it can be demonstrated that the result of the government's rule or policy is to limit in some significant degree the ease or effectiveness with which a speaker can reach a specific audience with a particular message, the government should lose the case unless it can establish that an important public objective unrelated to the message would be

sacrificed by any less restrictive alternative.

Tribe, *supra* at 686.

■ One factor in the balancing process is the nature of the forum for the expressive activity in question. "The nature of a place, 'the pattern of its normal activities, dictate the kinds of regulations of time, place and manner that are reasonable.'" *Grayned v. City of Rockford, supra* at 116, 92 S.Ct. at 2303 (quoting Wright, The Constitution on the Campus, 22 *Vand.L.Rev.* 1027, 1042 (1969)). "[P]laces that have traditionally been associated with the public exchange of views . . . represent areas within which tolerance for inhibitions on speech, petition and assembly is at a minimum, and government's burden of justification at its highest." Tribe, *supra* at 684. The public streets are one such "public forum."

> Wherever the title of streets and parks may rest, they have immemorially been held in trust for the use of the public and, time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions. Such use of the streets and public places has, from ancient times, been a part of the privileges, immunities, rights, and liberties of citizens.

*Hague v. C.I.O.*, 307 U.S. 496, 515, 59 S.Ct. 954, 964, 83 L.Ed. 1423 (1939).

■ However, the street and sidewalk are not the sole issue in the instant case. Expressive activity adjacent to other institutions, e. g., a school or a courthouse, may be regulated if it will otherwise "materially disrupt" the normal activities of the institution. *Grayned v. City of Rockford, supra,* 408 U.S. at 118, 119, 92 S.Ct. 2294. Regulation is permissible to prevent interference with the normal use of and access to the site of the expressive activity. *Amalgamated Food Employees Union v. Logan Valley Plaza, Inc., supra,* 391 U.S. at 321, 88 S.Ct. 1601. Concern over disruption of "normal activities" is less weighty where the institution has a political or speech-related function. Thus, picketing near a courthouse may be prohibited because the picketers' intention to influence judges, jurors or witnesses is inconsistent with the unbiased, unprejudiced administration of justice. *Cox v. Louisiana,* 379 U.S. 559, 566–67, 85 S.Ct. 476, 13 L.Ed.2d 487 (1965). On the other hand, picketing to protest against and to influence an elected or other political official at his city hall or capital office presents "entirely different considerations," *id.*; such activity, if peaceful, may not be prohibited as it is not incompatible with such semi-public facilities' purposes. *See* Tribe, *supra* at 690.

Defendants seek to place foreign missions in a category with courthouses, a category of public institutions which are inappropriate sites for expressive activity. Defendants apparently rely on the duty of the United States to protect foreign embassies from invasion, insult and offensive demonstrations, *Frend v. United States,* 69 App. D.C. 281, 100 F.2d 691, *cert. denied,* 306 U.S. 640, 59 S.Ct. 488, 83 L.Ed. 1040 (1938), and seemingly contend that foreign missions are not proper targets of expressions by individual citizens who might interfere with the official conduct of foreign relations. However, no court has adopted defendants' position, and Congress has rejected it. Section 112 of Title 18 of the United States Code prohibits, *inter alia,* demonstrations within 100 feet of a mission with intent to intimidate or harass foreign officials. Subsection (d) of this law states that

> (d) Nothing contained in this section shall be construed or applied so as to abridge the exercise of rights guaranteed under the first amendment to the Constitution of the United States.

That subsection was added to prevent the abridgement of legitimate expression and assembly near foreign missions. S.Rep.No. 92–1105, 1972 U.S.Code Cong. & Admin. News 4316, 4328. Picketing near the Mission should not be prohibited *per se.*

■ In balancing the rights of the plaintiff against the rights of Mission personnel and other residents, only the "substantial privacy interests" of the latter should be taken into account.

The ability of government, consonant with the Constitution, to shut off dis-

course solely to protect others from hearing it is, in other words, dependent upon a showing that substantial privacy interests are being invaded in an essentially intolerable manner. Any broader view of this authority would effectively empower a majority to silence dissidents simply as a matter of personal predilections.

*Cohen v. California*, 403 U.S. 15, 21, 91 S.Ct. 1780, 1786, 29 L.Ed.2d 284 (1971).

### *Legislative authority for restrictions at the Mission*

Plaintiff contends that defendants lack any legislative authority for the restrictions enforced by them at the Mission, and thus that the restrictions are unconstitutional because imposed in the exercise of defendants' unbridled discretion.

In *People v. Solomonow*, 56 Misc.2d 1050, 291 N.Y.S.2d 145 (Sup.Ct.1968), the defendants were acquitted of charges of disorderly conduct stemming from their crossing of police barricades on the Mission block. The court held that the police ban on demonstrations was not authorized by any properly drawn statute or ordinance vesting limited regulatory authority in police officials.

> Neither the State nor the City have regulated the use of the streets occupied by foreign consulates or embassies. In the absence of legislation administrative officials may not exercise prior restraints on the exercise of First Amendment rights.

> \*   \*   \*   \*   \*   \*

> . . . Neither City nor State authorizes the police to permanently and absolutely close a public street to those persons seeking to exercise their First Amendment rights.

291 N.Y.S.2d at 149–50.

Defendants rely on Section 435 of the New York City Charter for the authority to impose the challenged restrictions. Subsection a of that section provides in part:

> The police department and force shall have the power . . . to . . . disperse unlawful or dangerous assemblages and assemblages which obstruct the free passage of public streets, sidewalks, parks and places; . . . pre-

serve order at . . . all public meetings and assemblages . . . .

Plaintiff argues that this provision only permits the police to preserve order where the law is being violated, but does not authorize restrictions on peaceful expressive activity such as those imposed at the Mission.

■ Even if Charter § 435 were held to give the police a general authority to develop and enforce the practices challenged here, the breadth of the administrative discretion accorded by the charter requires that the police regulations be subject to "exacting judicial scrutiny." *A Quaker Action Group v. Morton*, 148 U.S.App.D.C. 346, 351, 460 F.2d 854, 859 (1971). That case involved a challenge to regulations limiting demonstrations on the White House sidewalk, and the court refused to defer to the government's judgment about Presidential safety.

> "A balancing of First Amendment freedoms against the requirements of Presidential safety may be left to other agencies in the first instance. But . . . the final judgment must rest with the courts. To enable the court to reach a reasoned conclusion, it is incumbent upon any party who would invoke Presidential safety as a paramount consideration to provide the court with the information necessary to an even-handed decision. \* \* \* There has been no effort here to justify the Government's argument beyond the flat words of the Secret Service director. First Amendment rights are too precious for sacrifice upon such an unsupported altar."

*Id.* (quoting *A Quaker Action Group v. Hickel*, 137 U.S.App.D.C. 176, 183, 421 F.2d 1111, 1118 (1969).

The Supreme Court has held unconstitutional statutes that permit local officials to regulate expressive conduct such as parades and street assemblies "in their completely uncontrolled discretion." *Cox v. Louisiana*, 379 U.S. 536, 557, 85 S.Ct. 453, 465, 13 L.Ed.2d 471 (1965). Administrative officials must be guided by "narrow, objective, and definite standards" in their regulation

of the exercise of first amendment freedoms. *Shuttlesworth v. Birmingham*, 394 U.S. 147, 150, 89 S.Ct. 935, 22 L.Ed.2d 162 (1969).

The Court more likely will defer to a *legislative* judgment about the proper balance of first amendment freedoms against competing governmental interests. For example, Rockford's prohibition of picketing that disrupts normal school activities was upheld because it "represent[ed] a considered and specific legislative judgment that some kinds of expressive activity should be restricted at a particular time and place, here in order to protect the schools." *Grayned v. City of Rockford, supra*, 408 U.S. at 121, 92 S.Ct. at 2306. Similarly, a prohibition against picketing near a courthouse was upheld because it represented "a legislative determination based on experience that such conduct inherently threatens the judicial process." *Cox v. Louisiana, supra*, 379 U.S. 559, at 566, 85 S.Ct. 476, at 481.

In addition to the City Charter, defendants rely on 18 U.S.C. § 112 as authority for their practices on the Mission block. Section 112 provides in pertinent part:

§ 112. Protection of foreign officials, official guests, and internationally protected persons.

(b) Whoever wilfully—

(1) intimidates, coerces, threatens, or harasses a foreign official or an official guest or obstructs a foreign official in the performance of his duties;

(2) attempts to intimidate . . . ; or

(3) . . . within one hundred feet of any building . . . used . . . for diplomatic, consular, or residential purposes by—

(A) a foreign government, including such use as a mission to an international organization;

congregates with two or more other persons with intent to violate any other provision of this section;

shall be fined not more than $500 or imprisoned not more than six months; or both.

Plaintiff does not dispute the interest of the United States in protecting diplomatic officials from the conduct proscribed by Section 112; it maintains, however, that Section 112 permits *peaceful* demonstrations near a foreign mission.

*The ban on sound equipment*

Plaintiff contends that the police ban on the use of sound equipment on the Mission block not only violates the first amendment, but that it is contrary to the Administrative Code of the City of New York. Section 435–6.0 of the Administrative Code requires that the police commissioner issue a permit upon proper application with five days notice except for specified reasons. The Code provides in part:

f. Issuance of permit; terms.—The commissioner shall not deny a permit for any specific time, location or use, to any applicant who complies with the provisions of this section, except for one or more of the reasons specified in subdivision g hereof or for non-payment of the fee prescribed in subdivision h hereof, or to prevent overlapping in the granting of permits. . . .

g. Special restrictions.—The commissioner shall not issue any permit for the use of a sound device or apparatus:

1. In any location within five hundred feet of a school, courthouse or church, during the hours of school, court or worship, respectively, or within five hundred feet of any hospital or similar institution;

2. In any location where the commissioner, upon investigation, shall determine that the conditions of vehicular or pedestrian traffic or both are such that the use of such a device or apparatus will constitute a threat to the safety of pedestrians or vehicular operators;

3. In any location where the commissioner, upon investigation, shall determine that conditions of overcrowding or of street repair or other physical conditions are such that the use of a sound device or apparatus will deprive the pub-

lic of the right to the safe, comfortable, convenient and peaceful enjoyment of any public street, park or place for street, park or other public purposes, or will constitute a threat to the safety of pedestrians or vehicle operators;

4. In or on any vehicle or other device while it is in transit; or

5. Between the hours of ten p. m. and nine a. m.

Plaintiff contends that none of the foregoing conditions justifies the blanket policy of denying all applications for permits on the Mission block, and defendants have offered no evidence that the Commissioner made any of the determinations specified in the Code. Plaintiff argues that the sound ban on the block is thus an arbitrary exercise of defendants' discretion exceeding both statutory and constitutional limits. Defendants reply that the ban is reasonable and necessary to preserve the peace of the Mission and to avoid any obstruction of the work of the Mission.

*Irreparable injury*

■ Plaintiff contends that the denial of the requested preliminary relief would cause it to suffer irreparable injury and severe hardship. It is clear that if the restrictions imposed by the defendants are found to infringe to some degree the first amendment rights of plaintiff's members, that infringement will be irreparable in at least two senses. First, monetary damages are not likely to be recovered against the municipal officials, who could raise good faith defenses to damage actions. Second, money damages, even if available, would be inadequate, as timeliness is recognized as an important element of expressive activity. The opportunity to speak out on a matter of current interest, once lost, cannot be reclaimed.

Defendants argue that irreparable injury will not be suffered because the restrictions imposed on plaintiff are not complete; it may engage in first amendment activity anywhere but on the Mission block. However, the Supreme Court has stated:

> It goes without saying that "one is not to have the exercise of his liberty of expression in appropriate places abridged on the plea that it may be exercised in some other place."

*Grayned v. City of Rockford, supra,* 408 U.S. at 118 n.40, 92 S.Ct. at 2305 (quoting *Schneider v. State,* 308 U.S. 147, 163, 60 S.Ct. 146, 84 L.Ed. 155 (1939).

■ Upon due consideration of the facts and circumstances presented, the Court finds that the substantial interest which the United States has in protecting the personnel and premises of foreign diplomatic missions precludes the grant of preliminary injunctive relief. *Rubenstein v. Murphy,* No. 71 Civ. 2291 (S.D.N.Y. May 26, 1971) (Croake, J.); *Greenberg v. Murphy,* 329 F.Supp. 37 (S.D.N.Y.1971) (Gurfein, J.). There is substantial empirical evidence that to allow expanded demonstrations in front of the Soviet Mission would unduly and unnecessarily impair this interest. The area presently designated for picketing was selected for reasons which make sound sense under the special conditions existing on the block; the requirement that after dark, demonstrators are asked to reduce the noise level is entirely reasonable; the object of the police to accommodate both the demonstrators' rights of assembly and the right of nondemonstrators to peaceful and unobstructed passage consistent with safety meets fundamental concerns fairly. Basically the whole subject matter is one of degree and judgment and no better yardsticks than the ones employed are presented or apparent.

The restrictions complained of apply to demonstrators and amplified noise immediately in front of the Soviet Mission. There are no similar limitations in the overflow adjacent areas. The case for irreparable harm has not been made out at this time. Indeed the character of this street and the pattern of usual activity on it strongly suggest that the restrictions herein are reasonable both as to numbers of demonstrators

1304

and the use of amplified sound equipment in the immediate area.

◼ Balancing the interests at stake herein, the police restrictions upon picketing and amplified noise in the immediate vicinity of the Soviet Mission clearly pass constitutional muster, certainly so far as concerns a demand for provisional relief. The restrictions at issue do not unduly or unnecessarily abridge the exercise of the plaintiff's members' liberty of expression in this area. They are reasonably narrow enough so as to afford the right of demonstrators to express their views in numbers and noise sufficient to carry their message without unreasonable impediment. The numerical restrictions have been sufficiently time-tested over the years, without any apparent swell of complaint thereof and it may be reasonably inferred that no really undue restraints are felt by those inclined to demonstrate for their causes against the Mission. This conclusion does not suggest in any way that the motivation of the plaintiff and its members is other than laudable and their intentions peaceful.

◼ Accordingly the plaintiff's motion for a preliminary injunction is denied. The application of the United States for leave to appear as an amicus curiae in this action, because of the governmental interest herein, is granted.

The foregoing shall constitute the findings of fact and conclusions of law required by Federal Rule of Civil Procedure 52(a).

SO ORDERED.