621 F.2d 471
 6 Media L. Rep. 1085
 CONCERNED JEWISH YOUTH, Plaintiff-Appellant,
v.
Robert J. McGUIRE, in his official capacity as Police
Commissioner of the City of New York, Edward Koch, in his
official capacity as Mayor of the City of New York, and the
New York City Police Department, Defendants-Appellees.
 No. 228, Docket 79-7456.
 United States Court of Appeals,
Second Circuit.
 Argued Dec. 7, 1979.
Decided March 27, 1980.
 
 Howard C. Buschman III, New York City (Willkie, Farr & Gallagher, John M. McEnany, Jeanne M. Luboja, New York City, of counsel), for plaintiff-appellant.
 Pamela McGovern Gaskins, New York City (Allen G. Schwartz, Corp. Counsel of the City of New York, L. Kevin Sheridan, New York City, of counsel), for defendants-appellees.
 Robert B. Fiske, Jr., U. S. Atty., S. D. N. Y., New York City, Katherine J. Trager, Jane E. Bloom, Michael H. Dolinger, Asst. U. S. Attys., New York City, of counsel, on amicus curiae brief for the U. S.
 Before WATERMAN, MOORE and MANSFIELD, Circuit Judges.
 MOORE, Circuit Judge:
 
 
 1
 This appeal raises interesting questions of the extent to which the First Amendment rights of demonstrators may be subjugated to an overriding governmental interest. Appellant Concerned Jewish Youth ("CJY") sought a declaration under 42 U.S.C. § 1983 (1976) that restrictions applied to its demonstrations in front of the Russian Mission in New York City violated the First and Fourteenth Amendments. CJY also sought an order preliminarily enjoining the New York City police from restricting CJY's demonstrations. CJY now appeals from a judgment denying the motion for a preliminary injunction and dismissing the complaint (Honorable Milton Pollack, District Judge, Southern District of New York). Because no new evidence was to be adduced at trial, the District Court consolidated the hearing on the motion with the action on the merits and issued one decision disposing of both matters reported at 469 F.Supp. 1296.
 
 
 2
 CJY is a membership association founded in 1975 and headquartered at Queens College in Flushing, New York. The purposes of CJY are mainly to combat Anti-Semitism, to preserve and strengthen Judaic heritage, and to work for the causes of Soviet and Arab Jewry. The group has maintained its independence from what CJY has characterized as other violence-oriented Jewish groups such as the Jewish Defense League (JDL). (Tr. 6, 16, 74). Of the approximately 300 members of CJY, there are 50 to 70 active members. (Tr. 15). However, as one of the co-chairmen of CJY testified, about 10% of these active members are also members of JDL or other activist groups and presumably endorse the more militant methods those groups employ. (Tr. 15, 16).
 
 
 3
 The members of CJY sought to protest on the sidewalk in front of the Russian Mission to publicize and condemn the Soviet Union's treatment of Jews. The Russian Mission is on East 67th Street between Lexington and Third Avenues in the 19th police precinct in the City of New York. A co-chairman of CJY went to the 19th precinct in June, 1978 to apply for a permit to use sound equipment in front of the Mission. The Captain in charge, Mario Selvaggi, informed CJY that only twelve persons would be allowed to demonstrate in a "bull pen" diagonally across the street from the Mission.[1] Any additional demonstrators could protest on East 67th Street between Park and Lexington Avenues. (Tr. 23, 143). In addition, Captain Selvaggi informed CJY that no sound device would be allowed on East 67th Street between Third and Lexington Avenues (i. e., on the Mission block). Sound devices would only be permitted on the northeast corner of East 67th Street and Lexington Avenue. (Tr. 25, 44). The Captain referred to the "Dollinger" decision, which outlined various restrictions which would be put on demonstrations by certain groups in front of the Mission.[2] Although CJY was not a party to that action, Captain Selvaggi applied the rationale behind the Dollinger restrictions to CJY.
 
 
 4
 CJY held a demonstration at the Russian Mission in June, 1978. In accordance with Captain Selvaggi's instructions to CJY, only twelve persons were allowed inside the "bull pen", and they were not permitted to have a sound device. A few other demonstrators stayed off the Mission block, as they had been instructed to do. Another demonstration planned for January 5, 1979 was not held because CJY felt that the demonstration, like the previous one, would be "ineffective and unsuccessful". (Appellant's Br. 15).
 
 
 5
 CJY makes various First Amendment claims that will be bifurcated for the purpose of discussion. The first claim is that the restrictions on the location and number of demonstrators violate their rights under the First Amendment. The second is that the restrictions on the use of a sound device impair their freedom of speech. We find that the time, place and manner restrictions in this case are necessary to further a strong governmental interest, and affirm the holding of the District Court.
 
 I.
 
 6
 The right to a public forum for the discussion and interplay of ideas is one of the foundations of our democracy. "Wherever the title of streets and parks may rest, they have immemorially been held in trust for the use of the public and, time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions." Hague v. CIO, 307 U.S. 496, 515, 59 S.Ct. 954, 964, 83 L.Ed. 1423 (1939).
 
 
 7
 However, the right to speak, assemble, and discuss is not absolute. Although the "government has no power to restrict such activity because of its message", Grayned v. City of Rockford, 408 U.S. 104, 115, 92 S.Ct. 2294, 2303, 33 L.Ed.2d 222 (1972) (footnote omitted), it is "equally clear . . . that reasonable 'time, place and manner' regulations may be necessary to further significant governmental interests, and are permitted". Id. (footnote omitted). The Supreme Court recently stated "We have often approved restrictions (on time, place and manner) provided that they are justified without reference to the content of the regulated speech, that they serve a significant governmental interest, and that in so doing they leave open ample alternative channels for communication of the information". Virginia Pharmacy Board v. Virginia Consumer Council, 425 U.S. 748, 771, 96 S.Ct. 1817, 1830, 48 L.Ed.2d 346 (1976). The balancing process which is required in these situations was best described by Justice Blackmun: "Although American constitutional jurisprudence, in the light of the First Amendment, has been jealous to preserve access to public places for purposes of free speech, the nature of the forum and the conflicting interests involved have remained important in determining the degree of protection afforded by the Amendment to the speech in question". Lehman v. City of Shaker Heights, 418 U.S. 298, 302-303, 94 S.Ct. 2714, 2717, 41 L.Ed.2d 770 (1974) (citations omitted).
 
 
 8
 Thus, once the restrictions are found to be content-neutral, and it is determined that alternative avenues of communication are available, the question becomes one of balancing, based on the nature of the forum, the governmental interest in enforcing the restrictions against the inhibitions the restrictions impose on the speech-related activity. See, e. g., L. Tribe, American Constitutional Law, 682-84 (1978). We are convinced that these contested restrictions are not directed at the content of the speech. No one has suggested, nor has any evidence been proffered, that there is or has been any attempt to suppress the expression of CJY's ideas merely because of what its members are saying.
 
 
 9
 There are easily accessible alternative channels for communication of CJY's ideas. These alternatives include the twelve persons in the "bull pen" and the open access to the overflow areas on Lexington Avenue and further west on 67th Street. We do not think that the First Amendment guarantees news publicity for speakers, nor does it guarantee the continued fervor of one's fellow demonstrators.[3]
 
 
 10
 The question then comes down to one of balancing the interests involved. We appreciate that the rights granted by the First Amendment are important, but hold that the governmental interest in the protection of the Russian Mission and the residents of the area outweighs the comparatively minor restrictions placed on CJY.
 
 
 11
 The government interest in providing security, safety and silence may, at times, be superior to asserted First Amendment rights. A statute, ordinance or regulation which embodies these interests will be valid even though it infringes on purported constitutional guarantees. Thus, the government may properly restrict First Amendment rights associated with jails (all demonstrations, Adderley v. Florida, 385 U.S. 39, 48, 87 S.Ct. 242, 247, 17 L.Ed.2d 149 (1966)); schools (loud behavior may be excluded, Grayned v. City of Rockford, 408 U.S. 104, 121, 92 S.Ct. 2294, 2306, 33 L.Ed.2d 222 (1972)); courthouses (statute prohibiting picketing valid on its face, Cox v. Louisiana, 379 U.S. 559, 564, 85 S.Ct. 476, 480, 13 L.Ed.2d 487 (1965)); and military installations (political campaign appearances may be banned, Greer v. Spock, 424 U.S. 828, 838, 96 S.Ct. 1211, 1217, 47 L.Ed.2d 505 (1976)).
 
 
 12
 The United States and the New York City Police have a substantial interest in protecting foreign officials and their property. The New York City Police, pursuant to their mandate in § 435 of the New York City Charter, must "preserve the public peace, . . . (disperse) assemblages which obstruct the free passage of public streets, sidewalks, parks and places; (and) protect the rights of persons and property . . . ." This includes the members and property of a Foreign Mission.
 
 
 13
 The United States is charged by various international obligations to protect diplomatic personnel and has recognized its obligation statutorily. See, e. g., Article 22(2) of the 1961 Vienna Convention on Diplomatic Relations, 23 U.S.T. 3227, 3237, TIAS No. 7502 (protection of missions); Section 16 of the Headquarters Agreement between the United Nations and the United States (61 Stat. 758, 763) (Headquarters of member states to be protected from disturbance); and 18 U.S.C. § 112 (1976) (providing for severe criminal penalties for harassment or assault of foreign officials).
 
 
 14
 We do not think that the federal statute (18 U.S.C. § 112) was designed to take all power to control demonstrations at Foreign Missions away from local authorities as CJY argues. The relevant provision was enacted "to protect the peace, dignity and security of foreign officials and guests in their embassies, consulates, missions, residences and offices". Sen.Rep.No. 92-1105, 92d Cong., 2d Sess. reprinted in U.S.Code Cong. & Admin.News 4316, 4328 (1972). Any actions local authorities may take to aid in protecting foreign officials furthers this intent of Congress in enacting the legislation. The law did not set maximum standards of protection, but rather set minimum standards, and specifically left open the situation where local authorities might use stricter controls. See Pub.L. 92-539, 86 Stat. 1070, 1073, § 3 (1972); Pub.L. 94-467, 90 Stat. 1997, 2001, § 10 (1976).
 
 
 15
 When the New York City Police instituted these restrictions on demonstrations in front of the Mission, they were simply protecting the Mission and its personnel. There have been numerous instances of violence at the Russian Mission. In 1971 and 1976 shots were fired at and into the Mission. In 1975, containers of red paint were thrown at the Mission splattering paint on walls and doors. Finally, in 1977 and 1978 there were problems with unruly demonstrators in front of the Mission. (Br. of U.S. at 2-3). More recently, the Russian Mission was bombed for the first time.[4]
 
 
 16
 The Police implemented the restrictions because of this violence and because they were aware that even a peaceful demonstration could be infiltrated by members of a violent group. (Tr. 85-86). One Co-chairman of CJY admitted that through deceit or inadequate screening by CJY, violent demonstrators could be among their ranks at a protest. (Tr. 54-56). Finally, one police officer testified that even peaceful demonstrators walking immediately adjacent to the Mission could become stirred to violence, due to the emotional reaction to seeing the Russian Mission. (Tr. 132). Because of the potential violence which might result when persons demonstrate in front of the Mission, the restrictions were properly imposed.
 
 
 17
 Testimony at trial established that the only reasonable place for the 12 demonstrators would be in the bull pen. (Tr. 127-30). There they can be seen from the Mission, but do not interfere with Mission personnel or property, and do not interfere with the synagogue, police station, schoolhouse, and firehouse across the street from the Mission. These restrictions are no greater than required to maintain the governmental interest involved in this case. Therefore, we agree with and affirm Judge Pollack's holding:
 
 
 18
 "There is substantial empirical evidence that to allow expanded demonstrations in front of the Soviet Mission would unduly and unnecessarily impair this interest (in protecting the Soviet Mission). The area presently designated for picketing was selected for reasons which make sound sense under the special conditions existing on the block; the requirement that after dark, demonstrators are asked to reduce the noise level is entirely reasonable; the object of the police to accommodate both the demonstrators' right of assembly and the rights of nondemonstrators to peaceful and unobstructed passage consistent with safety meets fundamental concerns fairly. Basically the whole subject matter is one of degree and judgment and no better yardsticks than the ones employed are presented or apparent." 469 F.Supp. 1296 at 1303.
 
 
 19
 The restrictions are in line with Justice Marshall's declaration that "The nature of a place, 'the pattern of its normal activities, dictate the kinds of regulations of time, place, and manner that are reasonable.' " Grayned v. City of Rockford, 408 U.S. at 116, 92 S.Ct. at 2303 (footnote omitted).
 
 
 20
 Finally, the privacy interests of the residents of the block must be briefly considered. "(T)he homes of men, sometimes the last citadel of the tired, the weary and the sick, can be protected by government from noisy, marching, tramping, threatening picketers and demonstrators . . . ." Gregory v. Chicago, 394 U.S. 111, 125-26, 89 S.Ct. 946, 954, 22 L.Ed.2d 134 (1969) (Black, J. concurring opinion). See also, Cohen v. California, 403 U.S. 15, 21, 91 S.Ct. 1780, 1786, 29 L.Ed.2d 284 (1971); Kovacs v. Cooper, 336 U.S. 77, 89, 69 S.Ct. 448, 454, 93 L.Ed. 513 (1949). Here, the residents of the block do have some right not to be obstructed, bothered, or abused by myriad demonstrators on their street. Although the New York Police have not explicitly instituted the restrictions because of this factor, they have tacitly acknowledged a need for privacy in adopting the standards set out in Dollinger.[5] This privacy interest is an important consideration in tilting the balance toward the constitutionality of the restrictions.
 
 
 21
 Further supporting our holding is the fact that the restrictions impose only a minimal inhibition on the ability of CJY to communicate its ideas. The group is free to demonstrate diagonally across from the Mission where the Mission personnel can see and hear them. (Tr. 142). Additional space for demonstrating is available in the immediate area. When asked what was the purpose of the demonstration in front of the Mission, a co-chairman of CJY stated "To publicize the cause of Soviet Jewry". (Tr. 20). This suggests that the audience at which the demonstration was directed was the American public at large. We see little impact on the effectiveness of the communication, or on the ability of CJY to convey its ideas to those persons, because of these restrictions. The fact that the restrictions only minimally inhibit expression serve to lighten the balance on the side of CJY, confirming our holding that these restrictions are permissible.
 
 
 22
 One final point that must be discussed before addressing the "sound device" restriction is the manner in which these restrictions were imposed. Surely a narrowly drafted legislative enactment specifically outlining the restrictions would be constitutionally proper. But this case involves the decision of the police made according to power vested in them by a municipal ordinance. Pursuant to that ordinance, the police adopted restrictions on demonstrations in front of the Russian Mission, which had been outlined, in part, in a state court opinion.
 
 
 23
 The New York City Charter § 435 states, in relevant part,
 
 
 24
 "The police department and force shall have the power and it shall be their duty to preserve the public peace . . . disperse unlawful or dangerous assemblages and assemblages which obstruct the free passage of public streets, sidewalks, parks, and places; protect the rights of persons and property, guard the public health, preserve order at . . . all public meetings and assemblages; (and) . . . control and restrict the movement of . . . pedestrian traffic for the facilitation of traffic and the convenience of the public as well as the proper protection of human life and health. . . ."
 
 
 25
 Pursuant to this mandate, and after analyzing the previous violence, disturbances, and the potential for danger in front of the Soviet Mission, the New York City police sought to prohibit entirely demonstrations on the Russian Mission block. Later, in an action brought by residents of the block, Millan House Inc. v. Murphy, Civ. No. 10560 (Sup.Ct.N.Y. County 1971) Justice Isidore Dollinger of the New York County Supreme Court approved the police's decision respecting demonstrations. But he held, among other things, that the groups involved in that suit would be limited to 12 demonstrators in the immediate vicinity of the Russian Mission. The police then evidently revised the restrictions on demonstrations to 12 persons in the "bull pen" area and added the overflow location. When Captain Selvaggi took command of the 19th Precinct, he made some minor changes in the restrictions on demonstrating, but basically kept the same arrangements. (Tr. 147).
 
 
 26
 We find that the restrictions imposed by the police pursuant to the mandate of § 435 are constitutionally proper. Although the ordinance gives the police a certain amount of latitude in protecting persons, "Condemned to the use of words, we can never expect mathematical certainty from our language". Grayned v. City of Rockford, 408 U.S. at 110, 92 S.Ct. at 2300 (footnote omitted). "It is, of course, undisputed that appropriate, limited discretion, under properly drawn statutes or ordinances, concerning the time, place, duration, or manner of use of the streets (and presumably sidewalks) for public assemblies may be vested in administrative officials. . . . " Cox v. Louisiana, 379 U.S. 536, 558, 85 S.Ct. 453, 466, 13 L.Ed.2d 471 (1965). This is especially true where, as here, the ordinance has been given a narrow construction by the police department. Furthermore, here there is little real effect on the legitimate expression of ideas.[6] As has been pointed out, CJY is allowed to demonstrate and convey its feelings within sight of the Russian Mission. The use of the overflow area by the excess over 12 demonstrators does not have a real and substantial effect on CJY's conveying the claimed iniquity of the treatment of Jews in Russia.
 
 
 27
 Additionally, the fact that the ordinance deals with police protection in New York City is of import. As Justice Frankfurther has said:
 
 
 28
 "We must be mindful of the enormous difficulties confronting those charged with the task of enabling the polyglot millions in the City of New York to live in peace and tolerance. Street-preaching in Columbus Circle is done in a milieu quite different from preaching on a New England village green." Niemotko v. Maryland, 340 U.S. 268, 284, 71 S.Ct. 325, 328, 334, 95 L.Ed. 325, 328 (1951) (Frankfurter, J., concurring).
 
 
 29
 Likewise, demonstrating on a narrow sidestreet in the crowded Upper East Side of New York City presents more difficult problems than protesting on Main Street in a small community.
 
 II.
 
 30
 We turn now to the restriction on the use of sound equipment on the Mission block. In this case, use of the device was not banned, but rather the location at which the loud speaker could be used was restricted. That restriction also passes constitutional muster, and we affirm the decision of the District Court on this point.
 
 
 31
 We note initially that because sound devices have a way of making a listener out of someone who may not wish to hear, their use may be curtailed. See Kovacs v. Cooper, 336 U.S. 77, 86-87, 69 S.Ct. 448, 453, 93 L.Ed. 513 (1949). This is because freedom of speech does not include the right to intrude or force one's viewpoint on a hapless resident or bypasser. Cohen v. California, 403 U.S. 15, 21, 91 S.Ct. 1780, 1786, 29 L.Ed.2d 284 (1971). "In his home or on the street (an unwilling listener) is practically helpless to escape this interference with his privacy by loud speakers except through the protection of the municipality." Kovacs, supra, 336 U.S. at 87, 69 S.Ct. at 453. Finally, the Supreme Court has pointed out "The hours and place of public discussion can be controlled". Saia v. New York, 334 U.S. 558, 562, 68 S.Ct. 1148, 1150, 92 L.Ed. 1574 (1948).
 
 
 32
 We hold that as applied to the appellants in this case the restrictions on their use of sound equipment, imposed after tacit consideration of the Dollinger decision and the New York Administrative Code,[7] do not run afoul of the constitution. Implicit in the restrictions is the finding that there is an overriding governmental interest in maintaining the area immediately in front of the Russian Mission free from excessive noise. This is primarily for the benefit of the personnel working and living in the Mission, but is also for the benefit of the area residents and the various institutions near the Mission (a school, synagogue, firehouse, and police station). We cannot say that the restriction, adopted by the police department after consideration of the locale, imposes such a barrier to CJY's right to free expression so as to be constitutionally infirm. See A Quaker Action Group v. Morton, 516 F.2d 717, 734 (D.C.Cir.1975). Such restrictions are especially necessary in the City of New York where multifarious interests associated with the millions of residents, visitors, and workers must be balanced so that all may live in mutual tolerance.
 
 
 33
 We affirm the decision of the district court.
 
 MANSFIELD, Circuit Judge (dissenting):
 
 34
 I dissent. We have long recognized the inadvisability of entrusting to the protectors of public order the unchecked authority to restrain First Amendment activity, for there is a tension, requiring careful and sensitive balancing, between freedom and order. Therefore the Constitution has long been read to prevent the police from imposing substantial prior restraints except pursuant to considered and detailed legislative guidelines. Even then, close judicial scrutiny must follow.
 
 
 35
 This case presents an unfortunate example of the consequences of carte blanche legislative authorization and deferential judicial review. In my view the New York City police, in the name of peace and public order, have engaged in an unlawful overkill and prior restraint of appellants' exercise of their First Amendment right to picket and demonstrate in a peaceful and orderly manner. The restrictions go far beyond measures that are justifiable as reasonably necessary to public needs. The reason for this sad state of affairs is that state legislation and the City Charter purport to vest the police with virtually unlimited authority to impose restrictions upon lawful demonstrations. In the absence of any legislative standards the police, instead of proscribing only activity posing a serious threat to society and searching for less restrictive alternatives, have chosen the easier course of riding rough-shod over the demonstrators' exercise of First Amendment rights in the very place where they are entitled to the most protection our city's streets. It is rather ironic and unfortunate that at a time when the President of our country is calling upon all peoples and nations to demonstrate against the recent Soviet invasion of Afghanistan, our local police should be vested with powers enabling them completely to bar response to this exhortation.
 
 
 36
 We start with certain indisputable propositions of law. The first of these is that public places, particularly streets and sidewalks, are the normal and natural locations for our citizens' exercise of their First Amendment right of free speech.
 
 
 37
 "Wherever the title of streets and parks may rest, they have immemorially been held in trust for the use of the public and, time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions. Such use of the streets and public places has, from ancient times, been a part of the privileges, immunities, rights, and liberties of citizens." Hague v. C. I. O., 307 U.S. 496, 515, 59 S.Ct. 954, 964, 83 L.Ed. 1423 (1939) (Roberts, J.).
 
 
 38
 See also Lehman v. City of Shaker Heights, 418 U.S. 298, 303, 94 S.Ct. 2714, 2717, 41 L.Ed.2d 770 (1974); Wolin v. Port of New York, 392 F.2d 83, 89 (2d Cir.), cert. denied, 393 U.S. 940, 89 S.Ct. 290, 21 L.Ed.2d 275 (1968).
 
 
 39
 While the state may reasonably regulate the time, place and manner of the exercise of First Amendment rights as necessary to protection of other compelling public interests, Grayned v. City of Rockford, 408 U.S. 104, 115-16, 92 S.Ct. 2294, 2302-03, 33 L.Ed.2d 222 (1972); Police Dept. v. Mosley, 408 U.S. 92, 98, 92 S.Ct. 2286, 2291, 33 L.Ed.2d 212 (1972); Adderley v. Florida, 385 U.S. 39, 87 S.Ct. 242, 17 L.Ed.2d 149 (1966); Cox v. Louisiana, 379 U.S. 536, 554-55, 85 S.Ct. 453, 464, 13 L.Ed.2d 471 (1965), "time and place" regulations can enormously hinder the individual's ability to engage in effective advocacy. A number of limitations on this type of regulation are therefore essential. Where discretion is to be vested in administrative officials, it must be "appropriate, limited discretion under properly drawn statutes or ordinances." Cox v. Louisiana, supra, 379 U.S. at 558, 85 S.Ct. at 466 (emphasis supplied). See also Shuttlesworth v. City of Birmingham, 394 U.S. 147, 89 S.Ct. 935, 22 L.Ed.2d 162 (1969); Saia v. New York, 334 U.S. 558, 562, 68 S.Ct. 1148, 1150, 92 L.Ed. 1574 (1948). The exercise of First Amendment rights may not be abridged at the unbridled will or broad discretion of government officials, even though this would doubtless facilitate law enforcement and spare public expense and inconvenience. The more substantial the encroachment on protected rights, the greater the need for carefully considered and articulated standards. "Access to the 'streets, sidewalks, parks, and other similar public places . . . for the purpose of exercising (First Amendment rights) cannot constitutionally be denied broadly. . . .' " Grayned v. City of Rockford, supra, 408 U.S. at 117, 92 S.Ct. at 2304 (quoting Amalgamated Food Employees v. Logan Valley Plaza, Inc., 391 U.S. 308, 315, 88 S.Ct. 1601, 1606, 20 L.Ed.2d 603 (1968)).
 
 
 40
 Even when regulations are fully authorized by explicit and narrow legislative authority, they must be "narrowly tailored to further the State's legitimate interest," Grayned v. City of Rockford, supra, 408 U.S. at 116-17, 92 S.Ct. at 2303-2304; Police Dept. v. Mosley, supra; Cox v. New Hampshire, 312 U.S. 569, 575-76, 61 S.Ct. 762, 765, 85 L.Ed. 1049 (1941). The state bears the burden of justifying restrictions, e. g., Cohen v. California, 403 U.S. 15, 20, 91 S.Ct. 1780, 1785, 29 L.Ed.2d 284 (1971). Regulations which take the form of prior restraints are subject to particularly exacting judicial scrutiny. Organizations for a Better Austin v. Keefe, 402 U.S. 415, 419, 91 S.Ct. 1575, 1577, 29 L.Ed.2d 1 (1971); Carroll v. President & Comm'rs of Princess Anne, 393 U.S. 175, 181, 89 S.Ct. 347, 351, 21 L.Ed.2d 325 (1968). Moreover, exercise of First Amendment rights, when logically related to a particular forum, is further protected from regulations which would preclude the use of that place. Brown v. Louisiana, 383 U.S. 131, 86 S.Ct. 719, 15 L.Ed.2d 637 (1966) (plurality opinion); Albany Welfare Rights Org. v. Wyman, 493 F.2d 1319, 1323-24 (2d Cir.), cert. denied, 419 U.S. 383, 95 S.Ct. 66, 42 L.Ed.2d 64 (1974).
 
 
 41
 In balancing the individual's right to demonstrate against the concern for quiet or the protection of others, the competing interests must be assessed on an individual basis; blanket bans and absolute prohibitions against picketing in front of or near a site have been universally condemned where a less restrictive and more sharply tailored alternative may be formulated. As the Supreme Court stated in Police Dept. v. Mosley, supra, 408 U.S. at 100-01, 92 S.Ct. at 2293:
 
 
 42
 "Predictions about imminent disruption from picketing involve judgments appropriately made on an individualized basis, not by means of broad classifications, especially those based on subject matter."
 
 
 43
 In short, although limited regulation is permitted, it must be carefully defined and sufficiently circumscribed to minimize the opportunities for abuse of discretion on the part of administrative officials, lest this treasured constitutional right of free speech and expression be subjected to excessive or unnecessary restraints.
 
 
 44
 None of the foregoing principles are likely to make the policeman's lot a happy one. The proper acquittal of this heavy responsibility is difficult. The officer's life would be easier if he had broad discretion to squelch free speech and assembly without the necessity of tailoring any restraints to what is absolutely necessary in each individual case. Unfortunately such discretion has been permitted in the present instance, where the police have been accommodated by both state and city. The result, unsurprisingly, is an excessive restraint. With due respect, the majority has either misconceived the function of the police in this tension or given only lip service to basic time-honored principles of free speech and expression.
 
 
 45
 Section 435 of the New York City Charter provides in pertinent part that "(t) he police department and force shall have the power . . . to preserve the public peace (and) disperse unlawful or dangerous assemblages and assemblages which obstruct the free passage of the public streets, sidewalks, parks and places." It is pursuant to this all-encompassing grant of power that the police claim the authority to impose restrictions on the block of the Soviet Mission. This is not their first such essay. The police previously attempted to bar all demonstrations on this very block, claiming authority under this same general statute. The courts of New York had no difficulty concluding that § 435 could not constitutionally, and did not, authorize such a prohibition:
 
 
 46
 "Neither City nor State authorizes the police to permanently and absolutely close a public street to those persons seeking to exercise their First Amendment rights. Such prohibition is therefore unlawful." People v. Solomonow, 56 Misc.2d 1050, 291 N.Y.S.2d 145, 150 (N.Y. County 1968).
 
 
 47
 While the present restrictions on demonstrations are not quite as absolute as the total ban invalidated in Solomonow, their effect is nearly the same. Twelve lonely demonstrators, without sound equipment, may walk in a small barricaded area far removed from the Soviet Mission at the end of the block on the other side of the street. Should any more than 12 wish to demonstrate, they must move to a different block. This handful of demonstrators is unlikely to be seen or heard, while demonstrators choosing to picket other sites must endure no such restrictions. If the statute does not authorize absolute bans, I must conclude that the present regulations are similarly unauthorized and unlawful.
 
 
 48
 If the statute is to be read as conferring authority on the police to implement these restrictions, it does not meet constitutional requirements. This broad grant of uncontrolled authority, which the police in their absolute discretion have used in deciding that all assemblages except those restricted to 12 people cordoned off down the block are "dangerous," is hardly in keeping with the requirement that a regulatory statute be "precise and narrowly drawn," Edwards v. South Carolina, 372 U.S. 229, 236, 83 S.Ct. 680, 684, 9 L.Ed.2d 697 (1963); Cox v. Louisiana, 379 U.S. 559, 562, 85 S.Ct. 476, 479, 13 L.Ed.2d 487 (1965); Niemotko v. Maryland, 340 U.S. 268, 272, 71 S.Ct. 325, 327, 95 L.Ed. 328 (1951). No standards are offered to guide the police in balancing the individual's right to assemble, picket and demonstrate against the necessity for preservation of public order and protection of the Soviet Mission. Indeed, as in Niemotko v. Maryland, supra, 340 U.S. at 272, 71 S.Ct. at 327, "(n)o standards appear anywhere; no narrowly drawn limitations; no circumscribing of this absolute power; no substantial interest of the community to be served." The regulation, instead of being designed to protect constitutional rights, appears to be tailor-made to preserve "law and order" at any cost.
 
 
 49
 Regardless of the lack of statutory authority or of a constitutionally acceptable basis for the police restrictions in the present case, it is clear that the police failed to make an adequate showing of the necessity for such harsh conditions as were imposed upon appellants. In the first place the police failed at the outset, when advised by Concerned Jewish Youth (CJY) that its members proposed to demonstrate peacefully and in orderly fashion on the sidewalk in front of the Soviet Mission, to ascertain whether CJY could be expected to act responsibly and whether it posed any substantial risk of violence or danger to the Mission or anyone else. Instead the local police followed their practice of automatically and blindly applying an order that had been entered seven years earlier by the late Justice Isidore Dollinger of the New York State Supreme Court in Millan House v. Murphy, Civ. No. 10560 (N.Y. County 1971), which involved an entirely different group of defendants, some believed to be militant (Jewish Defense League, Student Struggle for Soviet Jewry), that had previously engaged in massive and unruly demonstrations in front of the Soviet Mission. With minimal attention to First Amendment concerns and without any findings as to less restrictive alternatives, the court there imposed restrictions limited to the defendants in that case.
 
 
 50
 Seven years later, after being advised of the CJY's plans the police, rather than fulfilling their duty of making an individualized determination, informed them of the policy, pursuant to the unlimited discretion vested in them by § 435, of applying the "Dollinger" order to all persons who might seek to demonstrate in the future. This was patently wrong and violated the police's basic obligation to determine what restrictions, if any, might be required in this entirely different case. "(I)n our system, undifferentiated fear or apprehension of disturbance is not enough to overcome the right to freedom of expression." Police Dept. v. Mosley, supra, 408 U.S. at 101, 92 S.Ct. at 2293 (quoting Tinker v. Des Moines School District, 393 U.S. 503, 508, 89 S.Ct. 733, 737, 21 L.Ed.2d 731 (1969)).
 
 
 51
 Indeed, as the record shows, this is an entirely different case from Millan House v. Murphy. If the police had investigated they would have found that, unlike the parties to the "Dollinger" case, the CJY has rejected association with militant organizations working in the cause of Soviet Jewry. The CJY, in contrast to the Jewish Defense League (JDL) and Student Struggle for Soviet Jewry (SSSJ), is dedicated to accomplishment of its aims without violence. It first approached the police, not vice versa, on the subject of demonstrating, even though it was under no legal obligation to do so. It sought to demonstrate peacefully by simply marching in an oval shape during daylight hours on the 15' 4 wide sidewalk in front of the Soviet Mission, without harassing anyone entering or leaving the Mission or blocking the street or entrance to any building. The CJY has indicated that it was even willing to consider being required to restrict its demonstrations to a "bull-pen" or confined area in front of the Mission or to one side of its entrance. The CJY has no history of violence and there is no evidence that it might be goaded into violence or harassment or used as a cover for such kind of operations. Indeed Judge Pollack, who viewed some CJY members, referred to it as "an organization of nice young men from Queens whose purposes have a very therapeutic appeal."
 
 
 52
 In what appears to be a belated effort to justify their automatic, reflex reliance on the "Dollinger" order to refuse any demonstration on the sidewalk near the Mission, the police attempted in the district court to show that they had learned that others, such as FALN, JDL and anti-Castro Cubans, had planned to attach themselves to any "large-scale" demonstrations in order to plant bombs. The majority further points to news articles about a recent bombing (since the district court hearing) which did not involve any demonstration at all. However, it is not contended that any of this had anything to do with the CJY, which is a peaceful organization, or its members. The CJY, moreover, does not seek "large-scale" demonstrations and its history of giving advance notice to the police of its plan to demonstrate is inconsistent with fears of violence or lawlessness on its part. Many people walk past the Soviet Mission daily. If someone intends to bomb the Mission, he will do it without any assistance from the CJY.
 
 
 53
 The police further seek support for their action by pointing to 18 U.S.C. § 112, which makes it a federal crime to demonstrate within 100 feet of a foreign mission with intent to coerce, harass or obstruct a foreign official. That statute, however, affords the City no justification for the draconian restrictions imposed here. Aside from the necessity of proving specific intent and in the present case the CJY expressly disclaims any intent to harass or obstruct members of the Mission the same statute provides that nothing in it shall be construed to abridge First Amendment rights, 18 U.S.C. § 112(d). Moreover, in enacting § 112 Congress took pains repeatedly to express concern for recognition of the right to "legitimate expression and assembly." See S.Rep. No. 92-1105, 92nd Cong., 2nd Sess. (1972), U.S.Code Cong. & Admin.News 4316, 4328.
 
 
 54
 In short, the restriction imposed by the New York police on the CJY is impermissibly broad and, in the absence of a finding based on substantial evidence that less restrictive alternatives would not reasonably protect the public interest in peace and order, is a violation of appellants' constitutional rights. It embodies a philosophy of governmental power that is contrary to basic precepts repeatedly endorsed by the Supreme Court with respect to the First Amendment. The police erroneously presume that an order issued with respect to other persons under other circumstances may thereafter be applied to all, regardless of a sharp difference in circumstances. They also presume that any would-be demonstrators, though not shown to be associated with the parties to the earlier order, are dangerous. They ignore the fact that to justify these extreme restrictions, the burden is on the police to investigate and balance the interests in each case, with respect for the presumption in favor of exercise of First Amendment rights. This difficult task they have refused to face.
 
 
 55
 Moreover, the attitude of the City is that since the "Dollinger" order permits some demonstrating, however far from the Mission, that should suffice. This ignores the principle that since the effectiveness of any demonstration depends on its proximity to the target and the relevant audience, it is unlawful to exile demonstrators to an irrelevant milieu. Wolin v. Port Authority of New York, supra, 392 F.2d at 90. The purposes of a peaceful and orderly rally or demonstration are to try to impress the target in this case the Soviet occupants of the Mission and to publicize the cause to others. Neither objective is served by a demonstration elsewhere, around the corner or at the other end of the block on the other side of the street (where the sidewalk is substantially the same width, 16 feet 4 inches as compared with 15 feet 4 inches). If persons may be permitted to demonstrate in front of a school, Grayned v. City of Rockford, supra, in a library, Brown v. Louisiana, supra, or at the White House and its executive offices, A Quaker Action Group v. Morton, 516 F.2d 717 (D.C. Cir. 1975), surely a right to demonstrate in front of a foreign mission should not be denied out of hand. See Greenberg v. Murphy, 329 F.Supp. 37 (S.D.N.Y.1971) (permitting picketing at side entrance of United States Mission to UN and presentation of petitions at front entrance).
 
 
 56
 For similar reasons the police's absolute ban on use by the CJY of any sound equipment whatsoever on the Soviet Mission block cannot be justified as a matter of law. Indeed it clearly violates § 435-6.0 of New York City's Administrative Code, which obligates the City to issue sound permits under specified conditions. CJY has unequivocally agreed in writing to abide by these conditions, affirming that it would not employ sound equipment during school, worship or sleeping hours. The effect of the denial is to give the Mission more protection from sound equipment than other New York City residents. We are not here confronted with the constitutionality of a law prohibiting all sound equipment in residential areas, which would present a different case, but with a law that entitles the CJY to a permit. The majority urges that the police gave "tacit consideration" to the statute. Surely the police must do more than give tacit consideration to the governing law they must follow it.
 
 
 57
 Notwithstanding the CJY's entitlement to a permit, the police simply brushed off its application by again invoking the seven-year old prohibitions of the "Dollinger" order, even though it involved different parties, a different time and different conditions. In my view the denial is unconscionable.
 
 
 58
 It is an unfortunate if understandable fact of life that because of the very nature of their function of maintaining law and order in a community the police cannot be relied upon to respect First Amendment rights where to do so would only serve to increase their own burdens and risks. For this reason it is vital that the courts, as the only haven of refuge for those seeking protection of their rights, be eternally vigilant and willing to command police respect for First Amendment rights rather than acquiesce in their denial, which is the easier course. The erosion of human rights is usually begun with the excuse that curtailment is essential to meet an emergency or avoid a threat to public order. But the ultimate strength of our constitutional guarantees lies in their being unhesitatingly applied in times of crisis and tranquility alike. "If the provisions of the Constitution be not upheld when they pinch as well as when they comfort, they may as well be abandoned." Home Building & Loan Assn. v. Blaisdell, 290 U.S. 398, 483, 54 S.Ct. 231, 256, 78 L.Ed. 413 (1943) (Sutherland, J., dissenting). With due respect, the majority in my view abdicates its responsibility for insuring that First Amendment rights are not lightly cast aside or ignored in the name of law and order.
 
 
 59
 For these reasons I would remand the case to the district court with directions to enter a preliminary injunction on terms and conditions that will permit demonstrations by the CJY near the Soviet Mission, reasonably limited as to time, place, method and number of participants, in lieu of the cavalier denial through invocation of the so-called "Dollinger" order.
 
 
 
 [1]
 This bull pen was approximately 118' east of the front entrance of the Mission on the north side of East 67th Street (the Mission is on the south side). It was in front of an apartment building at a point on the block where the sidewalk is the widest. (Tr. 129)
 
 
 [2]
 Millan House Inc. v. Murphy, Civ. No. 10560 (Sup.Ct.N.Y. County 1971). Dollinger was a suit brought by residents of the area against, among others, the New York Police and the JDL
 
 
 [3]
 At trial, a co-chairman of CJY stated that CJY's right to convey its point of view even in the bull pen and surrounding areas was precluded because "I would assume that the press would not be very interested in covering 12 people in a bull pen" (Tr. 35), and that "the 11 people with me, were not very much inclined to think that the rally was a success and want to do it again. They were kind of embarrassed. I would have trouble getting those particular people to come back". (Tr. 35-36)
 
 
 [4]
 On Tuesday evening, December 11, 1979, the Russian Mission was bombed by a terrorist group. Four policemen and four employees of the Mission were injured in the bombing. N.Y. Times, Dec. 12, 1979, § A, p. 21, col. 1-6
 
 
 [5]
 Dollinger was a suit by residents of the area. Demonstrators were limited in the area specifically because of the previous infringement on the residents' privacy right
 
 
 [6]
 Cf. Erznoznik v. City of Jacksonville, 422 U.S. 205, 216, 95 S.Ct. 2268, 2276, 45 L.Ed.2d 125 (1975) (discussion of criteria used to determine if a state statute is valid on its face)
 
 
 [7]
 Section 435-6.0 which deals with the regulation of sound devices in New York City