INTERNATIONAL SOCIETY FOR KRISHNA CONSCIOUSNESS, INC., Brian Rumbaugh, and Michael Mager, on behalf of themselves and all other members of International Society for Krishna Consciousness, Inc., Plaintiffs,

v.

The CITY OF NEW YORK, a municipal corporation, and Robert McGuire, as Commissioner of Police of the City of New York, Defendants.

No. 79 CIV. 1118.

United States District Court, S. D. New York.

Dec. 4, 1979.

Levy, Gutman, Goldberg & Kaplan by Jeremiah S. Gutman, Donna Glasgow, New York City, for plaintiffs.

Allen G. Schwartz, Corp. Counsel, City of New York by Rosemary Carroll, Asst. Corp. Counsel, New York City, Legal Division, New York City Police Dept. by John Rudden, New York City, for defendants.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW ON MOTION FOR PRELIMINARY INJUNCTION

MOTLEY, District Judge.

Plaintiffs are the International Society for Krishna Consciousness, Inc., (ISKCON) and two of its individual members. They have brought suit on their own behalf and on behalf of all other similarly situated members of ISKCON for declaratory and injunctive relief, pursuant to 42 U.S.C. § 1983 and 28 U.S.C. §§ 1651, 2201 and 2202. Plaintiffs allege that their rights under the First and Fourteenth Amendments to the Federal Constitution have been violated. They invoke jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343(3) and (4). Defendants are the City of New York and its Police Commissioner, Robert McGuire.

The matter is now before the court on plaintiffs' motion for an order preliminarily enjoining defendants from prohibiting plaintiffs, through arrests, threats of arrests and prosecutions, from peaceably proselytizing and soliciting donations, and from otherwise peaceably exercising their First Amendment rights, on the sidewalks immediately adjacent to the Visitors' Gate at the United Nations Headquarters (U.N.) on the east side of First Avenue between 45th and 46th Streets in the City of New York. The motion for preliminary injunction is denied. The court makes the following findings of fact and conclusions of law after a hearing on the motion.

ISKCON is a religious society. The proselytizing and soliciting of funds in which plaintiffs wish to engage in the immediate vicinity of the U.N. Visitors' Gate is part of a religious ritual known to plaintiffs as Sankirtan. Sankirtan is mandated by the Vedic Scriptures, ISKCON's basic religious text.

■ It is beyond dispute that the practice of Sankirtan is an activity protected by the First Amendment to the Federal Constitution, made applicable to the states by the Fourteenth Amendment, as many cases have recognized. *See, e. g., ISKCON v. Rochford,* 585 F.2d 263 (7th Cir. 1978); *ISKCON V. McAvey,* 450 F.Supp. 1265 (S.D.N. Y.1978); *ISKCON v. State Fair of Texas,* 461 F.Supp. 719 (N.D.Tex.1978); *ISKCON v. Hays,* 438 F.Supp. 1077 (S.D.Fla.1977); *ISKCON v. Conlisk,* 374 F.Supp. 1010 (N.D. Ill.1973); and *ISKCON v. City of New Orleans,* 347 F.Supp. 945 (E.D.La.1972).

■ It is also not disputed that the exercise of First Amendment rights is subject to reasonable regulation by government. *Cox v. New Hampshire,* 312 U.S. 569, 574, 61 S.Ct. 762, 765, 85 L.Ed. 1049 (1941); *Cantwell v. Connecticut,* 310 U.S. 296, 60 S.Ct. 900, 84 L.Ed. 1213 (1940).

The narrow issue before this court is whether plaintiffs' constitutional rights are violated by a policy of the New York City Police Department which bars plaintiffs from proselytizing and soliciting funds in the immediate vicinity of the Visitors' Gate at the U.N. Headquarters.

The U.N. holds title to the area in New York City in which its Headquarters is located. This area is between 42nd Street on the south, 48th Street on the north, the Franklin D. Roosevelt Drive on the east, and the east side of First Avenue on the west. The City of New York owns the sidewalk in front of the U.N. Headquarters on the east side of First Avenue between 42nd and 48th Streets. The east side of First Avenue is open to pedestrian traffic.

It was originally deeded by the New York State Legislature to the U.N. However, the U.N. transferred the east side of First Avenue back to the City of New York. This was done for security reasons. The New York City police do not have jurisdiction to arrest persons on any property to which the U.N. holds title. The above described property to which the U.N. holds title is located behind a readily scalable fence bordering the easternmost border of the sidewalk on the east side of First Avenue between 42nd and 48th Streets. This property is under the jurisdiction of the U.N. and is patrolled by U.N. security guards.

The New York City Police Department has been designated as the proper governmental authority to guarantee the peace and tranquility of the U.N. Headquarters. In order to carry out this responsibility, the New York City Police Department decided, among other things, to ban all First Amendment activity on the east side of First Avenue between 42nd and 48th Streets, thus creating a buffer zone between the U.N. Headquarters and all possible security risks. The east side of First Avenue and the adjacent area to the west, i. e., the west side of First Avenue between 42nd and 48th Streets and between First and Second Avenues is specially patrolled by the City of New York, pursuant to the "Agreement between the United Nations and the United States of America regarding the Headquarters of the United Nations," 22 U.S.C. § 287, historical note § 16.[1] (The U.N. Agreement). Accordingly, the New York City Police Department has also designated six areas for demonstrations and

---

1. The pertinent provisions of the Agreement between the United Nations and the United States of America regarding the Headquarters of the United Nations are as follows:

§ 16 (a) _ _ _ _ _ The appropriate American authorities shall exercise due diligence to ensure that the tranquility of the headquarters district is not disturbed by the unauthorized entry of groups of persons from outside or by disturbances in its immediate vicinity and shall cause to be provided on the boundaries of the headquarters district such police protection as is required for these purposes.

(b) _ _ _ _ _ If so requested by the Secretary-General, the appropriate American authorities shall provide a sufficient number of police for the preservation of law and order in the headquarters district, and for the removal therefrom of persons as requested under the authority of the United Nations. The United Nations shall, if requested, enter into arrangements with the appropriate American authorities to reimburse them for the reasonable cost of such services.

picketing within the area bounded by the west side of First Avenue between 42nd and 48th Streets and Second Avenue.[2] It has agreed to allow plaintiffs to exercise their First Amendment rights at any place in the area except the east of First Avenue and in front of the United States Mission to the U.N. on the southwest corner of 45th Street and First Avenue. First Avenue between 42nd and 48th Streets is also known as United Nations Plaza. The U.N. Visitors' Gate is located on the east side of First Avenue between 45th and 46th Streets. The dispute in this case focuses on this small area.

Lieutenant John J. Judge, a defendant witness in this action and an operations officer for the New York City Police Department responsible for regulating demonstrations and other forms of First Amendment activity in the proximity of the U.N., testified that the police officers would voice no objections to First Amendment activity on the west side of First Avenue, except in front of the United States Mission to the United Nations. (Tr. at 202–203). He testified that the sole reason for the ban was the peace and security of the U.N. More specifically he testified that the ban was imposed to prevent crowd formations on the east side of First Avenue which might heighten the security risks to the U.N. and thus interfere with the peace and tranquility of the U.N. Headquarters which by agreement it has undertaken to ensure.

The court finds that crowd formation is a serious problem in the immediate vicinity of the Visitors' Gate and heightens the security risks. The court also finds that the practice of Sankirtan in the vicinity of the Visitors' Gate tends to obstruct the flow of traffic.

The Visitors' Gate is, admittedly, the sole entry and exit point to the U. N. for many thousands of visitors each day. Although there is a separate entrance between 42nd and 43rd Streets for U. N. delegates and other personnel, such persons also enter the U. N. Headquarters through the Visitors' Gate. (Tr. at 99). On an average day, at least 3,000 visitors arrive at the Visitors' Gate. (Tr. at 97). These crowd formations thus generated each day are exacerbated, from a security point of view, by heavy vehicular traffic near the Visitors' Gate. Each day, up to 100 tour and City buses arrive at the landing islands in the roadway near the Visitors' Gate. These landing islands stretch from 45th to 47th Streets on the east side of First Avenue. (Tr. at 100). These buses discharge passengers onto the landing islands in front of the Visitors' Gate and in the immediate vicinity of the Gate, producing at times constant streams of pedestrian traffic on the east side of First

---

**2.** Defendants' Exhibits H, I and J are three internal police department memoranda, and are the only writings presented in this proceeding which discuss the police department policies at issue here. The scope of activities to which the policies are applied is also apparent from the testimony of the police department witness who testified in this case, Lieutenant John F. Judge. See Transcript of Hearing of May 8, 1979, pp. 167–221. Exhibit H, entitled "Laws relating to the Protection of the United Nations Headquarters District", and dated September 16, 1970, discusses police designation of areas for picketing and assembly (para. 11), regulation of assemblies and demonstrations (para. 12), leafletting (para. 13) and the carrying of signs and placards (para. 14). Somewhat inconsistently with defendants' position here, the memorandum notes a New York state precedent invalidating the conviction of two individuals under the state's disorderly conduct statute (N.Y.Penal Law § 240.20), on the ground that no congregating with others was shown (para. 16). *People v. Carcel,* 3 N.Y.2d 327, 165 N.Y.S.2d 113, 144 N.E.2d 81 (1957). Paragraph 17 of this memorandum states that:

"The above cited statutes and court cases, while applicable to all demonstrations, may be utilized by members of the force in connection with the regulation of vehicular and pedestrian traffic in the area of the United Nations as well as in the interest of assuring that the business of the dignitaries and diplomats in attendance thereat may be conducted and executed without interruption by disorderly persons or groups of demonstrators."

Exhibit I, entitled "Picketing Areas at the United Nations", sets forth the six areas.

Exhibit J is entitled "Policy of Parades and Demonstrations in the Area of the United Nations Complex". It describes four of the six locations as areas where demonstrations have traditionally been allowed, and discusses a large demonstration which was planned for May 27, 1978 in light of the department's policy.

Avenue, particularly between 45th and 47th Streets. The police are therefore concerned with keeping both pedestrian and vehicular traffic moving on the east side of First Avenue between 42nd and 48th Streets.

On some occasions, the evidence disclosed, the U. N. security guard posted inside the Visitors' Gate has been required to enlist the assistance of additional U. N. security guards to disperse crowds gathered at the Visitors' Gate. (Tr. at 140). U. N. security guards have requested plaintiffs to leave the immediate area of the Visitors' Gate because their practice of Sankirtan obstructed the already heavy flow of pedestrian traffic converging at the Gate. (Tr. at 100). The U. N. security guards have also received during the course of their duties complaints from visitors concerning the disruptive nature of plaintiffs' solicitations, and on at least one occasion, intervened in a dispute over a contribution to plaintiffs. (Tr. at 153). Plaintiffs have disregarded requests of U. N. security guards to move a distance of 100 feet from the immediate vicinity of the Visitors' Gate. (Tr. at 161). In order to forestall crowd formation, the New York City police officers try to discourage any continuous presence such as plaintiffs on the east side of First Avenue from 42nd to 48th Streets. (Tr. at 170).

The evidence also disclosed that many visitors to the U. N. Headquarters cross First Avenue to the west side and visit Dag Hammarskjold Plaza, a memorial at 47th Street and First Avenue, one block away from the Visitors' Gate, and are found at several other places along the west side of First Avenue.

It is undisputed that the United Nations must maintain the degree of security necessary to guard against people entering the U. N. Headquarters with explosives or weapons of any sort. The evidence disclosed that bombs have been found on the premises of the U. N. Headquarters, in spite of its own security procedures. The evidence was clear that because of the controversial nature of most of the issues debated at the U. N., there are thousands of demonstrators and picketers with which the police must deal regularly at the U. N.

United Nations officials have expressed an interest in this litigation concerning use of the sidewalk immediately in front of the Visitors' Gate, although they are not parties to this litigation. During a period of 5 years as many as 100 heads of state have visited the U. N. (Tr. at 113). A U. N. employee testified on the hearing, having been called as a witness for defendants. His testimony revealed that the U. N. stations a security officer at the top of the steps leading to the U. N. Headquarters which are inside the Visitors' Gate, about fifteen feet from the adjacent sidewalk where plaintiffs seek to practice Sankirtan. (Tr. at 107). Another United Nations security officer is posted about twenty feet inside the Visitors' Gate at a small building known as the "bomb shelter," where packages of entering visitors are checked. (Tr. at 111). However, there are eleven police officers regularly assigned to the U. N. area between 42nd and 48th Streets and First and Second Avenues. (Tr. at 211).

Plaintiffs seek access to the particular audience that comprises United Nations visitors because of the international character of the group. Plaintiffs also view tourists as people who are at leisure, not going to and from their places of employment, and therefore more receptive to plaintiffs' religious message. Plaintiffs say that by barring access to these visitors in the immediate vicinity of the Visitors' Gate their First Amendment rights are violated. In this connection, and as a result of attempts to settle this dispute before trial, plaintiffs now propose to place one member of their group on either side of the Visitors' Gate for the purpose of proselytizing and soliciting funds, thereby reducing the risk of obstruction to the flow of traffic. Plaintiffs have also insisted that since they are interested only in a one-on-one communication situation, their activities thus limited will not cause an assemblage of persons near the Gate.

▉ Plaintiffs rightfully contend that where First Amendment rights have been abridged, there is a clear showing of irrepa-

rable harm. In the case which they cite, *Elrod v. Burns*, 427 U.S. 347, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976), the Supreme Court ruled that:

> "The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." 427 U.S. at 373, 96 S.Ct. at 2690.

Defendants do not take issue with this ruling. However, defendants deny that there is any irreparable harm to plaintiff as a result of the total ban on First Amendment activity in the immediate vicinity of the Visitors' Gate.

■ Although the government may not bar access to one site for expression of ideas and beliefs simply because it prefers another, *Council of Greenburgh Civic Associations v. United States Postal Service*, 586 F.2d 935, 979 (2d Cir. 1978) (Kaufman, J., concurring) (citing *Thornhill v. Alabama*, 310 U.S. 88, 60 S.Ct. 736, 84 L.Ed. 1093 (1940)), it is proper for government to place reasonable restrictions of time, place and manner on the exercise of First Amendment rights in order to protect its own legitimate interests. As the Supreme Court said in *Cox v. New Hampshire*, 312 U.S. 569, 61 S.Ct. 762, 85 L.Ed. 1049 (1941):

> "If a municipality has authority to control the use of its public streets for parades or processions, as it undoubtedly has, it cannot be denied authority to give consideration, without unfair discrimination, to time, place, and manner in relation to other proper uses of the streets." 312 U.S. 569, 576, 61 S.Ct. 762, 766, 85 L.Ed. 1049.

*See also Wolin v. Port of New York Authority*, 392 F.2d 83 (2d Cir.), *cert. denied*, 393 U.S. 940, 89 S.Ct. 290, 21 L.Ed.2d 275 (1968).

■ It is undisputed that the City of New York has the authority to regulate the uses of the public streets in the immediate vicinity of the U. N. The court finds that the City has demonstrated that it has particularly weighty obligations to perform with respect to this function in the immediate vicinity of the Visitors' Gate and that its regulation of this area does not result in irreparable injury to plaintiffs and does not unreasonably restrict the exercise of First Amendment freedoms.

■ "[T]he mere fact of public ownership does not by itself require that a [place] be available as a public forum. . . . Prisons, hospitals, office buildings, and other public facilities frequently require regulations to ensure that free speech activities do not unreasonably interfere with their functions." *ISKCON v. Wolke*, 453 F.Supp. 869, 873 (E.D.Wis.1978). A showing of "weighty reasons" is required to justify restrictions by regulation of First Amendment activity, whether it involves some variant of the right to free speech or, as here, the free exercise of religion. *See Grayned v. City of Rockford*, 408 U.S. 104, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972); *Wolke, supra.*

■ It is well settled that governmental regulation of First Amendment activity must be narrowly tailored to achieve its ends. The Supreme Court has recently reiterated this requirement:

> " 'Precision of regulation must be the touchstone in an area so closely touching our most precious freedoms.' If the State has open to it a less drastic way of satisfying its legitimate interests, it may not choose a legislative scheme that broadly stifles the exercise of fundamental personal liberties." *Elrod v. Burns, supra*, 427 U.S. at 363, 96 S.Ct. at 2684 (citations omitted).

In analyzing governmental restrictions placed on the practice of Sankirtan in other cases, courts have required that the State's regulations be "so tailored to the problem as to justify [the] restraint." *ISKCON v. State Fair of Texas*, 461 F.Supp. 719, 723 (N.D.Tex.1978). In other words:

> "It is fundamental that specific restrictions on the exercise of first amendment expression are inherently suspect and bear a heavy presumption against their constitutional validity. A specific restriction on the exercise of first amendment expression is sustainable . . . only if the restraint is focused and neither overbroad nor overinclusive in meeting .

its objective, and only if it is unachievable by a less restrictive alternative." *ISKCON v. Bowen*, 456 F.Supp. 437, 443 (S.D.Ind.1978), *cert. denied*, —— U.S. ——, 100 S.Ct. 448, 62 L.Ed.2d 375 (1979).

The court finds that exclusion of plaintiffs from the immediate vicinity of the Visitors' Gate is a reasonable accommodation of the conflicting interests at stake, well-tailored to the exigencies presented at this heavily trafficked entry point to the U. N. Headquarters. *See Wolin v. Port of New York Authority, supra* at 94. This limitation on Sankirtan sufficiently preserves plaintiffs' access to the particular audience which plaintiffs desire to reach consisting of visitors to the U. N.

The court therefore concludes that the practical application of defendants' policy that excludes plaintiffs from the area immediately adjacent to the Visitors' Gate does not violate plaintiffs' First Amendment rights to freedom of speech and free exercise of their religion. *Concerned Jewish Youth v. McGuire*, 469 F.Supp. 1296 (S.D.N.Y.1979); *Greenberg v. Murphy*, 329 F.Supp. 37 (S.D.N.Y.1971).

Restrictions similar to those imposed by the defendants in the instant case have been upheld in *ISKCON v. McAvey*, 450 F.Supp. 1265 (S.D.N.Y.1978) which involved the denial of plaintiffs' motion for a preliminary injunction to enjoin enforcement of regulations promulgated by the Port Authority of New York limiting the time, place and manner of the practice of Sankirtan at the World Trade Center. The regulations at issue included exclusion of plaintiffs from the most heavily trafficked and most densely crowded areas of the World Trade Center. Rejecting plaintiffs' argument that defendants had failed to demonstrate a compelling justification for restriction of their exercises of First Amendment rights, the court held that plaintiffs, by failing to show irreparable injury and a likelihood of success on the merits, under the second prong of the test for preliminary injunction, had not met the standard of proof for the issuance of a preliminary injunction.

The court noted that defendants, under the authority of *Wolin v. Port of New York Authority, supra*, had the power to issue regulations reasonable under the circumstances to stem First Amendment activity of those persons likely to disrupt the ordinary operations of the World Trade Center. The court observed that the existence of large crowds and constant pedestrian traffic flow into the World Trade Center furnished a sufficiently compelling justification for the curtailment of Sankirtan as this activity materially obstructed the orderly flow of traffic essential to ordinary operation of the facility.

▇ The motion for preliminary injunction here is denied on the ground that plaintiffs have failed to meet the burden of proof required for the issuance of a preliminary injunction. More specifically, plaintiffs have failed to prove "possible irreparable injury *and* either 1) probable success on the merits *or* 2) sufficiently serious questions going to the merits to make them fair ground for litigation *and* a balance of hardships tipping decidedly toward the party requesting preliminary relief. *Caulfield v. Board of Education*, 583 F.2d 605, 610 (2d Cir. 1978).

Submit order in five days on five days' notice.