Michael J. OLIVIERI, J. Matthew Foreman, Michael Dillinger, Tom Kohler, Richard Ferrara, Edmund W. Trust, Hugh R. Bruce, John D. Edwards, Joseph Brown, Julius J. Spohn, Bernard L. Tansey, Clint Winant, James Doyle, David Lawlor, Jim Cannon, Ned Lynam, Edward Bryne, Michael Conley, Edward Harbur, Robert J. Buel, Christopher Wesolowski, Gary W. Spokes and Dignity-New York, Plaintiffs,

v.

Benjamin WARD, in his official capacity as Police Commissioner of the City of New York, Edward I. Koch, in his capacity as the Mayor of the City of New York, and the New York City Police Department, Defendants.

No. 85 Civ. 3269 (CBM).

United States District Court,
S.D. New York.

June 13, 1985.

Staurt W. Gold, Anne E. Verdon, Valerie Caproni, New York City, for plaintiffs.

Frederick A.O. Schwartz, Jr., Corp. Counsel by David D. Drueding, Jonathan L. Pines, New York City, for defendants.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

MOTLEY, Chief Judge.

Plaintiffs seek to enjoin defendants, on the basis of the First Amendment, from prohibiting them from demonstrating on the public sidewalk in front of St. Patrick's Cathedral during the annual "Gay Pride March" to be held in New York City on June 30, 1985. Defendants maintain that in order to prevent a hostile confrontation between plaintiffs and certain antagonistic demonstrators, both groups must be banned from the sidewalk and relegated to controlled demonstration areas across Fifth Avenue. The matter is before the court on the motion of plaintiffs for a preliminary injunction. A hearing was held on the motion on May 24, 28, and 29 and June 12. The court now makes the following findings of fact and conclusions of law.

### FINDINGS OF FACT:

Argument before the court has revealed that the following facts are not in dispute. They are therefore adopted as findings of the court. Plaintiffs are Dignity-New York (Dignity), an organization of homosexuals who are also Catholics, and several of its members. Defendants are the New York City Police Department, its Commissioner, and the Mayor.

Every year since 1970, there has been held in New York City a "Gay Pride March," which is the major annual demonstration of solidarity organized by the local gay and lesbian community. Approximately 75,000 people take part in the parade, which proceeds down Fifth Avenue from Central Park to Washington Square. This year's March is scheduled for June 30.

From 1976 through 1982, members of Dignity were permitted to step out of the line of marchers to hold a demonstration and religious service on the steps of St. Patrick's Cathedral on the east side of Fifth Avenue between Fiftieth and Fifty-

First Streets. The demonstrations were designed to convey to the passing marchers the message that homosexuals can be and frequently are practicing Catholics, and to protest the Roman Catholic Church's anti-gay position. Defendants do not dispute that Dignity, its purposes, and its activities, including its demonstrations in front of St. Patrick's, are totally peaceful and non-violent.

In 1981, two anti-gay demonstrators purporting to represent the Catholic War Veterans attacked some of the marchers and were arrested for disorderly conduct. No other violent incidents have been associated with Dignity's demonstrations. Despite this incident, Dignity was permitted to hold its usual demonstration on the steps of St. Patrick's during the 1982 March.

Prior to the 1983 March, defendants determined to close off access to the sidewalk and steps in front of St. Patrick's, which are normally open to the public during other parades, because of threats of violence made by anti-gay demonstrators who had unsuccessfully sued to enjoin the entire March. Despite predictions that thousands of anti-gay demonstrators would appear, between 50 and 100 actually attended and there was no violence. In 1984, defendants again determined to "freeze" the sidewalk in front of the Cathedral to avoid what they perceived to be the potential for conflict between Dignity and the anti-gay demonstrators. A last minute First Amendment challenge to this restriction was dismissed by Judge Duffy of this court on grounds of laches. Once again, in 1984, only about 100 anti-gay demonstrators appeared and no violence was reported. Two representatives of Dignity were permitted briefly onto the sidewalk in front of the Cathedral to lay a wreath.

In anticipation of this year's March, plaintiffs early on requested access to the sidewalk for a demonstration by their entire group of 200, arguing that the location in front of the Cathedral is crucial to conveying their message that gay people should be accepted as mainstream Catholics. The official organizers of the March, who hold a permit to occupy Fifth Avenue, have endorsed the proposed Dignity protest and have issued a resolution urging that Dignity be permitted access to the sidewalk as in the past.

Following the demand of an ad-hoc committee of anti-gay activists [1] for equal access to the sidewalk, however, defendants again decided to deny access to all groups and to establish demonstration areas for each group, out of sight and sound of each other, across Fifth Avenue on Fiftieth and Fifty-First Streets. Defendants, in addition, propose to allow "a limited number" of Dignity members again to hold a ten to fifteen minute wreath-laying ceremony in front of the Cathedral when the Dignity contingent passes by. The parade would halt at this point, so that the demonstration would primarily be observed by other members of Dignity. Since this plan was formulated by Police Department officials and no formal appeal had been made to Mayor Koch prior to the bringing of this action, the court required plaintiffs to appeal first to the Mayor. The Mayor has now stated his support for the Department's handling of the instant dispute. Exh. A. Since neither party called any witnesses, the court called Commissioner Ward as a witness.

Plaintiffs have proposed several alternatives to the total ban on more lengthy demonstrations in front of the Cathedral, including permitting a limited number of demonstrators from each group to occupy each end of the sidewalk with a buffer zone in between. As another alternative, the March organizers have agreed to permit Dignity to hold its demonstration and service in the eastern-most lane of Fifth Avenue directly in front of St. Patrick's.

---

1. The committee appears to consist of members of the Catholic War Veterans, the Knights of Columbus, and other groups. Defendants report that the anti-gay demonstrators, as they have for several years, are predicting increased attendance at their counter-demonstration this year. In addition, the police anticipate a disturbance by a group of Orthodox Jews from Brooklyn on Fifth Avenue between Forty-Seventh and Forty-Ninth Streets. There is no evidence that this action will focus on Dignity's demonstration or St. Patrick's Cathedral.

Defendants, nevertheless, have rejected any plan that provides for Dignity to maintain a presence in front of St. Patrick's throughout the parade as plaintiffs demand. Defendants instead have counter-offered to move the controlled demonstration areas across Fifth Avenue onto Fiftieth and Fifty-First Streets around the corner from St. Patrick's but still out of sight of each other. Plaintiffs reject this proposal because, like defendants' original plan, it puts them out of sight and sound of many of the marchers.

In response to the court's suggestion that both groups could be permitted controlled access to the sidewalk in severely limited numbers with a buffer zone in between, defendants have raised several objections. Defendants insist that mutually hostile gay and anti-gay demonstrators must be separated, preferably by a full city block, to avoid the danger of violence. Defendants further argue that even if the groups are sufficiently limited and separated to avoid violence between the sidewalk demonstrators, the potentially violent anti-gay demonstrators must be isolated from the main line of marchers. Defendants' counsel states that it is the City's policy not to allow hostile demonstrators to occupy the sidewalk directly adjacent to a parade possessing an official permit. Counsel further states that in past years, anti-gay demonstrators have jeered and spat upon participants in the March, and that the organizers of the 1985 March therefore have requested that counter-demonstrators be kept back from the line of marchers.

Defendants also argue that allowing Dignity alone to occupy the sidewalk would be an impermissible content-based restriction because it would deprive the anti-gay groups of *their* preferred symbolic backdrop. Defendants nevertheless report that the anti-gay groups have made no objection to defendants' plan to isolate the sidewalk and further concede that in keeping Dignity from demonstrating in front of the Cathedral, the anti-gay groups apparently would achieve exactly what they wanted.

CONCLUSIONS OF LAW:

In order to obtain a preliminary injunction, plaintiffs must demonstrate irreparable harm and either a likelihood of success on the merits or substantial questions going to the merits coupled with a balance of hardships tilting in their favor. *Mitchell v. Cuomo*, 748 F.2d 804, 806 (2d Cir.1984); *Sierra Club v. Hennessy*, 695 F.2d 643, 647 (2d Cir.1982). The loss of First Amendment rights itself constitutes irreparable injury. *Elrod v. Burns*, 427 U.S. 347, 373, 96 S.Ct. 2673, 2689, 49 L.Ed.2d 547 (1976); *414 Theater Corp. v. Murphy*, 499 F.2d 1155, 1160 (2d Cir.1974). Absent preliminary injunction, any injury to plaintiffs' First Amendment rights in this case would become irreparable on June 30, the date of this year's "Gay Pride March." Therefore, the question before the court is whether plaintiffs can demonstrate a likelihood of success on the merits of their First Amendment claim, or at least serious questions on the merits and a balance of hardships tilting in their favor.

The public sidewalks "have immemorially been held in trust for the use of the public and, time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions." *Hague v. Committee for Industrial Organization*, 307 U.S. 496, 515, 59 S.Ct. 954, 964, 83 L.Ed. 1423 (1939) (opinion of Roberts, J.). When a publicly owned place has been made generally available to the public for expressive activities, as the sidewalk along Fifth Avenue undeniably has, it will be considered, without more, to be a public forum. *United States v. Grace*, 461 U.S. 171, 177, 103 S.Ct. 1702, 1707, 75 L.Ed.2d 736 (1983). *See also Concerned Jewish Youth v. McGuire*, 621 F.2d 471, 473 (2d Cir.1980).

Government's ability to limit speech in a public forum, absent a compelling state interest of a kind not argued for by defendants here, is "very limited." *Grace*, 461 U.S. at 177, 103 S.Ct. at 1707. "[T]he government may enforce reasonable time, place, and manner regulations as long as the restrictions are 'content-neutral, are

narrowly tailored to serve a significant government interest, and leave open ample alternative channels of communication.'" *Id.* (citations omitted). *See also Clark v. Community for Creative Non-Violence,* — U.S. —, —, 104 S.Ct. 3065, 3069, 82 L.Ed.2d 221, 227 (1984). The court, in evaluating defendants' claim that the restriction on Dignity's demonstration is a constitutional time, place, and manner regulation, will address each of these requirements in turn.

### Content-Neutrality

Defendants argue that their plan to move both Dignity and the anti-gay protesters to demonstration areas away from the front of St. Patrick's Cathedral is content-neutral because it favors neither side of the dispute but merely bans all speech on the sidewalk in the interest of public order. In fact, there is no evidence that defendants seek to silence plaintiffs' message. Nevertheless, it is undeniable that the sidewalk in front of St. Patrick's has been made available to other demonstrators and parade participants in the past, and that both plaintiffs and their opponents are being removed because their speech is controversial and thought likely to cause a disturbance. The Supreme Court has held that restrictions on particular *subjects* of speech, in addition to limitations aimed at the *viewpoint* of individual speakers, may render invalid an attempted time, place, and manner regulation. "[A]bove all else, the First Amendment means that government has no power to restrict expression because of its message, its ideas, *its subject matter,* or its content." *Police Department v. Mosley,* 408 U.S. 92, 95, 92 S.Ct. 2286, 2290, 33 L.Ed.2d 212 (1972) (ban on picketing on certain subjects near school unconstitutional) (emphasis added). *Accord Consolidated Edison Company of New York, Inc. v. Public Serv. Comm'n,* 447 U.S. 530, 536–38, 100 S.Ct. 2326, 2332–34, 65 L.Ed.2d 319 (1980) (ban on bill inserts advocating either side of nuclear energy debate unconstitutional).

Subject matter restrictions have been approved as reasonable time, place, or manner regulations only when the setting of the speech raises special governmental concerns. *See, e.g., Greer v. Spock,* 424 U.S. 828, 96 S.Ct. 1211, 47 L.Ed.2d 505 (1976) (security on military base); *Lehman v. Shaker Heights,* 418 U.S. 298, 94 S.Ct. 2714, 41 L.Ed.2d 770 (1974) (captive audience on city transit system). "Greer and Lehman properly are viewed as narrow exceptions to the general prohibition against subject matter distinctions." *Consolidated Edison,* 447 U.S. at 539, 100 S.Ct. at 2334. No such exception applies here, where the forum traditionally has been open to all speakers and presents no special security problems such as are associated with military bases.

Therefore, defendants' attempt to ban all speech from the front of St. Patrick's Cathedral only on the day when the dominant subject matter will be gay rights is suspect as a subject matter distinction. Defendants nevertheless insist that since they seek not to suppress discussion on the subject but merely to move it across the street because of its alleged threat to public order, their plan passes the content-neutrality requirement. Even assuming, *arguendo,* that defendants' actions are content-neutral, the regulation still cannot pass muster under the other prongs of the time, place, and manner test.

### Important Governmental Interest

■ Defendants correctly assert that maintaining public order is an important governmental interest. When it seeks to justify curtailments on speech, however, government must do more than invoke "public order" in a general sense; it must show that there is a significant basis in fact for its prediction of *disorder.* Defendants' "undifferentiated fear or apprehension of disturbance is not enough to overcome the right to freedom of expression." *Mosley,* 408 U.S. at 101, 92 S.Ct. at 2293 (quoting *Tinker v. Des Moines Independent Community School District,* 393 U.S. 503, 508, 89 S.Ct. 733, 737, 21 L.Ed.2d 731

(1969)). On the undisputed facts before the court, it does not seem that defendants had much more than a speculative fear of unrest when they decided to close off the sidewalk in front of St. Patrick's Cathedral. The seven year experience of plaintiffs' full-scale demonstrations provides defendants with an unusually detailed and consistent factual record to serve as a basis for prediction. Although there was a minor scuffle caused by anti-gay activists in 1981, plaintiffs held their usual demonstration in front of the Cathedral in 1982 without incident—belying defendants' assertion that it is only the "freezing" of the sidewalk in 1983 and 1984 which has maintained order. Other than the 1981 incident, and despite veiled threats and annual predictions of mass demonstrations by anti-gay groups, there has been no other violence and no more than 100 demonstrators have ever appeared in opposition to Dignity. There is no rational basis for assuming that this year will be any different, or that anti-gay demonstrators will appear in front of the Cathedral in such numbers as would cause a major threat to public safety.

■ Moreover, that plaintiffs' speech concerns controversial issues which arouse popular passions is, if anything, an argument for affording Dignity's demonstration extra protection. It is precisely when speech in the public forum is provocative, challenging, and hotly contested that the core values of the First Amendment concerning the free exchange of ideas are most directly implicated—and that the state's duty to protect the speaker's right to speak is most pointedly called into play. As Justice Douglas wrote for the Supreme Court,

> a function of free speech under our system of government is to invite dispute. It may indeed best serve its high purpose when it induces a condition of unrest, creates dissatisfaction with conditions as they are, or even stirs people to anger. Speech is often provocative and challenging. It may strike at prejudices and preconceptions and have profound unsettling effects as it presses for acceptance

of an idea. That is why freedom of speech, though not absolute, is nevertheless protected against censorship or punishment, unless shown likely to produce a clear and present danger of a serious substantive evil that rises far above public inconvenience, annoyance, or unrest. There is no room under our Constitution for a more restrictive view. For the alternative would lead to a standardization of ideas either by legislatures, courts, or dominant political or community groups.

*Terminiello v. Chicago,* 337 U.S. 1, 4–5, 69 S.Ct. 894, 895–96, 93 L.Ed. 1131 (1949). *See also Bachellar v. Maryland,* 397 U.S. 564, 567, 570–71, 90 S.Ct. 1312, 1314, 1315–16, 25 L.Ed.2d 570 (1970); *Cox v. Louisiana,* 379 U.S. 536, 551–52, 85 S.Ct. 453, 462–63, 13 L.Ed.2d 471 (1965).

■ The case at bar does not concern complete suppression of speech, and therefore is not controlled by the "clear and present danger" standard or its modern equivalent. *See Brandenburg v. Ohio,* 395 U.S. 444, 447–48, 89 S.Ct. 1827, 1829–30, 23 L.Ed.2d 430 (1969) (per curiam). Nevertheless, the underlying values of *Terminiello* and its progeny compel the court to examine closely any assertion by the government that peaceful speech by peaceful demonstrators on a controversial public issue in a classic public forum must be curtailed even by a time, place, and manner restriction because of the hostile, angry reaction of others. Our system favors what Justice Fortas described as a "hazardous freedom," *Tinker,* 393 U.S. at 508, 89 S.Ct. at 737, which preserves the public forum for controversial speakers and does not permit anticipation of a hostile reaction to dictate when and where speech will be allowed.

In view of plaintiffs' long history of peaceful demonstrations and the absence of a significant factual basis for a heightened expectation of violence this year, the court finds that the "important state interest" alleged in this case is comparatively weak. In reaching this conclusion, the court stresses that this is not a case where the setting of the speech implicates special

government concerns. Fifth Avenue is not a military base, *see Greer v. Spock*, 424 U.S. 828, 96 S.Ct. 1211, 47 L.Ed.2d 505 (1976), or a jailhouse, *see Adderley v. Florida*, 385 U.S. 39, 87 S.Ct. 242, 17 L.Ed.2d 149 (1966), where extra security precautions are necessary. It is a major commercial thoroughfare and as such is the classic public forum.

Defendants rely on *Concerned Jewish Youth v. McGuire*, 621 F.2d 471 (2d Cir. 1980) (*CJY*), as support for the importance of their asserted governmental interest. In *CJY*, a divided Second Circuit panel upheld a ban on picketing in front of the Russian Mission in New York City and a requirement that demonstrators be confined to a "bull pen" diagonally across the street. *Id.* at 472. Judge Mansfield dissented, calling the restriction "unlawful overkill and prior restraint of appellants' exercise of their First Amendment right to picket and demonstrate in a peaceful and orderly manner." *Id.* at 478.

In any event, *CJY* is distinguishable on several grounds. First, the demonstrators in *CJY* included militant Jewish Defense League members. Second, the restriction was made in response to several instances of violence and an ongoing danger of terrorism and vandalism at the Mission. Third, the protection of the Russian Mission was deemed to be of heightened governmental concern because it implicated our delicate relationship with a powerful foreign adversary. Fourth, the Mission's location on a residential street implicated the privacy interests of local residents. *Id.* at 472–75. In the case at bar, by contrast, plaintiffs are an entirely peaceful group with a history of non-violent demonstrations, and neither potential terrorism nor international relations nor residential privacy are significant concerns on Fifth Avenue in Midtown Manhattan.

On facts analogous to *CJY*, in *International Society for Krishna Consciousness, Inc. v. City of New York*, 484 F.Supp. 966 (S.D.N.Y.1979) (ISKCON) (Motley, J.), this court ruled that the Police Department was justified in prohibiting plaintiff religious society from practicing Sankirtan, a ritual which includes proselytizing and soliciting funds, on sidewalks immediately adjacent to the visitors' gate at United Nations headquarters. *Id.* at 967–68. Again, the general state interest in maintaining order was bolstered by a factually grounded concern over terrorism and the government's particular interest in maintaining traffic flow and protecting the safety and convenience of United Nations visitors, some of whom had complained about the disruptive nature of plaintiffs' activities. Moreover, the ban applied to *all* First Amendment activities and did not single out one particularly controversial topic for regulation. *Id.* at 968–70.

In both *ISKCON* and *CJY*, the City had a significant, content-neutral reason to keep *all* demonstrators away from a particular site, in addition to substantial concerns about the actual activities of the respective plaintiffs. By contrast, in this case, the government's interests are based on speculation regarding disruption by third parties and there is no reason for heightened concern about terrorism or international embarrassment. In short, the state interests asserted in this case simply are not of the same magnitude as those implicated in *CJY* or *ISKCON*.

### Narrowly Tailored Regulation

■ Even assuming, again *arguendo*, that defendants are able to show that sufficiently important government interests are implicated by the facts of this case, defendants must still demonstrate that the asserted time, place, and manner regulation is narrowly tailored to serve those interests. *United States v. Grace*, 461 U.S. 171, 177–78, 181, 103 S.Ct. 1702, 1707–08, 1709, 75 L.Ed.2d 736 (1983). Once again, defendants' case is problematic on the facts presented. Despite plaintiffs' willingness to work with defendants on a compromise that would preserve plaintiffs' access to their preferred forum, the Police Department has rejected all suggested alternatives. While it is true, as defendants' counsel asserts, that the City is under no duty

to consider every possible plan put forth by plaintiffs, the existence of a feasible and significantly less restrictive alternative would cast doubt on defendants' assertion that the "freezing" of the sidewalk is a narrowly tailored method of maintaining public order.

One of plaintiffs' suggestions—that Dignity and the anti-gay demonstrators each be permitted to occupy a portion of the sidewalk in front of the Cathedral with a buffer zone in between—was also proposed by the court as a possible compromise at the hearing on the instant motion. The suggestion was rejected by defendants because it did not adequately separate the Dignity contingent from the potentially disruptive anti-gay demonstrators and, more importantly according to defendants' counsel, because it meant that the anti-gay group would be located directly adjacent to the passing parade. Counsel explained that this would violate the city's policy of keeping potentially disruptive antagonistic demonstrators at a reasonable distance from parades that possess official permits, and would create a danger of harassment and spitting incidents which the parade organizers had requested be prevented. Since the anti-gay demonstrators therefore must be removed from the sidewalk directly adjacent to the parade, defendants' counsel argues that content-neutrality requires that Dignity also be banned from the block.

Defendants make a facially appealing argument: Since both groups seek to avail themselves of the symbolic backdrop of St. Patrick's Cathedral, it is not for the state to decide that only one group may have that access. It is true, of course, that two objects can not occupy the same place at the same time. Thus, when two competing groups seek a street permit to parade on the same day, the City, of necessity, must choose between them, either on a first-come-first-served basis or by some other content-neutral method. The public sidewalk, however, is not assigned through a permit procedure; it is a traditional public forum which the City has generally left open for anyone who wishes to use it. In the absence of some formalized procedure

for assigning sidewalks to particular groups, plaintiffs' argument that they should get priority because they asked first for access to the sidewalk is without merit. To hold otherwise would be to invite the chaos of various groups scrambling to lock up particular public forums months or years in advance.

On closer reflection, however, the court is not persuaded by defendants' content-neutrality argument. The issue is not whether, given the specific facts of this case, there is justification for granting a *preference* to plaintiffs in the use of the forum. The question is whether there is a content-neutral reason to deny access for either or both groups to a public forum that is otherwise open to *everyone.* If the court correctly understands the City's policy, even if Dignity did not propose to demonstrate on the sidewalk in front of the Cathedral, the potentially disruptive anti-gay demonstrators would not be permitted near the parade on Fifth Avenue. Once this group, which has a history of harassing and attacking pro-gay demonstrators, is removed, so is the potential for any conflict with Dignity demonstrators. The accompanying state interest in maintaining order would thereby be satisfied in full, since there is no reason to expect conflict between plaintiffs and the rest of the marchers, whose organizers support the Dignity demonstration. Assuming that it is enforced in a content-neutral way, the City's policy of keeping hostile demonstrators away from officially sanctioned parades therefore provides a substantially less restrictive way to maintain order on Fifth Avenue during the Gay Pride March: Simply keep the anti-gay demonstrators at a reasonable distance from the parade and otherwise leave the public forum undisturbed.

Once again, the facts of this case distinguish it from *CJY* and *ISKCON,* in which the activities of plaintiffs *themselves* created disturbances and presented a potential threat to public order and safety. Here, plaintiffs propose merely to continue their tradition of peaceful demonstrations.

There has been no assertion by defendants of any overriding need to keep the sidewalk in front of St. Patrick's clear of demonstrators as a general matter, or to keep friendly demonstrators away from the site of a parade possessing a City permit. Therefore, if the City's policy of keeping *hostile* demonstrators away from recognized parades removes the anti-gay group from the Cathedral sidewalk to a controlled demonstration area set back from Fifth Avenue, the further removal of Dignity from an otherwise open public forum serves no additional state purpose.[2]

The court does not believe, despite the able and articulate advocacy of defendants' counsel, that permitting Dignity to hold its demonstration in front of the Cathedral while removing the anti-gay demonstrators would amount to an impermissible content-based distinction. The policy of protecting from disruption parades possessing City permits is content-neutral and presumably would be enforced no matter what messages were being disseminated.

For example, let us assume that the Catholic War Veterans and other like-minded groups were to obtain an official City permit to hold a "Family Values Parade" down Fifth Avenue on a certain Sunday and that a sympathetic group of Roman Catholics sought to hold a prayer vigil on the adjacent sidewalk. If, under this scenerio, a militant pro-gay group, with a history of attacking and spitting on "pro-family" marchers, were to announce its intention to hold a demonstration on the same spot at the same time, the City would no doubt be justified in keeping them behind barricades at a reasonable distance from the parade in order to prevent interference with the officially recognized event of the day. This would be nothing more than a reasonable time, place, and manner regulation. There would be no reason, on these facts, also to prevent the prayer group

from availing itself of its preferred public forum.

In the final analysis, under this more narrowly tailored approach, defendants would not be "giving" the forum to one group over another. They would merely be declining to interfere with speech in a traditional public forum except where the potential for disruption of a City-recognized parade requires that hostile demonstrators be kept at a reasonable distance.

This conclusion is bolstered by plaintiffs' undisputed observation that the primary agenda of the anti-gay demonstrators is to *prevent* plaintiffs' speech. To remove Dignity from its preferred public forum because of fear of disruption by its opponents would be, as plaintiffs have suggested, to provide a blueprint for a modified heckler's veto: Any group seeking to keep another group from using a particularly evocative public forum need only threaten to appear with a sufficiently large, disruptive group of counterdemonstrators and the entire area will be "frozen."

Another factual setting might present more troubling dilemmas for public officials seeking to remain content-neutral while balancing First Amendment rights against the need to maintain order. On the facts before the court, however, it is apparent that the evil to be prevented is the violent disruption of both Dignity's peaceful demonstration and the entire "Gay Pride March." Despite defendants' repeated reference to preventing violence between two "mutually hostile" groups, it is the anti-gay demonstrators and not Dignity's members who present the threat of violence. In that context, defendants' decision to prevent both Dignity and the anti-gay groups from demonstrating in front of St. Patrick's Cathedral is not a narrowly tailored means of serving the legitimate governmental ends at stake.

---

2. The court does not have before it the question whether the record of disruption caused by anti-gay demonstrators is sufficient to provide a basis for a time, place, and manner restriction removing them from the sidewalk adjacent to the parade. If, however, defendants lack a suf-

ficient basis to enforce their otherwise content-neutral policy of preventing interference with parades, they would also seem to lack a basis for predicting violence between the anti-gay demonstrators and Dignity members.

### Alternative Channels of Communication

Plaintiffs argue persuasively that to move their demonstration from the sidewalk in front of St. Patrick's to a side-street around the corner is to interfere seriously with their symbolic message, which is that gay people should be accepted as *mainstream* Catholics, and not shunted aside or reluctantly tolerated. The brief ten-minute demonstration directly in front of the Cathedral which defendants propose to allow, during which the parade would stop with the Dignity contingent in front of the Church and a "limited number" of members would be permitted on the sidewalk to lay a wreath, would not permit plaintiffs to convey their message to the entire passing parade of gays and their supporters. They would, as it were, merely be preaching to the converted.

In any event, in the absence of a content-neutral regulation that is narrowly tailored to serve important governmental interests, the existence of adequate alternative channels of communication cannot justify a restriction on First Amendment rights. "[T]he streets are natural and proper places for the dissemination of information and opinion; and one is not to have the exercise of his liberty of expression in appropriate places abridged on the plea that it may be exercised in some other place." *Schneider v. State*, 308 U.S. 147, 163, 60 S.Ct. 146, 151, 84 L.Ed. 155 (1939). *Accord Southeastern Promotions, Ltd. v. Conrad*, 420 U.S. 546, 556, 95 S.Ct. 1239, 1245, 43 L.Ed.2d 448 (1975). *See also United States v. Grace*, 461 U.S. 171, 180–81, 103 S.Ct. 1702, 1708–09, 75 L.Ed.2d 736 (1983).

CONCLUSION:

■ On the facts before it, the court concludes that plaintiffs have shown a likelihood of success on the merits of their First Amendment claim. Defendants have failed to persuade the court that their plan to "freeze" the sidewalk in front of St. Patrick's Cathedral during the "Gay Pride March" is content-neutral, that sufficiently important governmental interests are implicated by the facts of this case, that a more narrowly tailored alternative would not adequately serve whatever state interests *are* implicated, or that adequate alternative channels of communication are left open by defendants' proposed regulation. Defendants' predictions of violence are largely speculative and, to the extent that these predictions are factually grounded, are based on the likelihood of violent disruption by anti-gay demonstrators. As indicated above, defendants have content-neutral policies to maintain public order without interfering with the rights of peaceful groups to use the public forum. The limitations imposed on the public forum by defendants therefore are unreasonable both in terms of the numbers of demonstrators to be allowed on the sidewalk and the duration of time that they will be permitted to occupy the forum.

Since plaintiffs have demonstrated a likelihood of success on the merits, and since the alleged harm to plaintiffs' First Amendment rights would occur on June 30, the date of this year's March, plaintiffs also have made the requisite showing of irreparable harm. Plaintiffs therefore would be entitled to a preliminary injunction preventing defendants from denying them reasonable access to the sidewalk in front of St. Patrick's Cathedral during the March.

Defendants will not be prohibited from taking appropriate action, through the use of barricades and the deployment of officers, to maintain order and safety on Fifth Avenue during the parade. The court is confident that the Police Department, with its vast experience in crowd control at New York parades and demonstrations, can fashion a means of maintaining the public peace without denying plaintiffs access to their preferred public forum. It is not the role of the court to dictate the details of this peacekeeping effort. The court must intervene only when the police, faced with an admittedly difficult, discretionary task, overshoot their authority to regulate First Amendment activity. Such is the case here and, absent a more reasonable plan, plaintiffs will be entitled to preliminary injunctive relief.

626

In view of the Commissioner's expressed willingness to compromise and work with plaintiffs on a more reasonable plan, defendants are granted an additional 96 hours to formulate a plan that will permit a reasonable number of Dignity members to hold a peaceful demonstration on the sidewalk in front of St. Patrick's Cathedral for a reasonable period of time. This plan will be presented to the court at 5:30 p.m. on Monday, June 17, 1985 in Courtroom 506.